## INLAND CONSTRUCTION COMPANY *v.* RECTOR.

### Opinion delivered March 11, 1918.

1. IMPROVEMENT DISTRICTS—REMOVAL OF BOARD FROM OFFICE—RESTRAINING ORDER—ACTS OF DE FACTO OFFICERS.—The members of the Board of Directors of a local improvement district were removed from office by the city council, and on appeal to the circuit court for a writ of *certiorari,* that court assumed jurisdiction and rendered judgment restraining new members of the board from interfering with the old members in the discharge

of their duties, and quashing the order of the city council. *Held,* notwithstanding their removal, after the action of the circuit court, the old members of the board are *de facto* members of the Board of Improvement, and contracts made by them *held* binding.

2. PUBLIC OFFICERS—ACTS OF DE FACTO OFFICERS.—As to third persons, the acts of *de facto* officers are valid.

3. IMPROVEMENT DISTRICTS—RECOVERY BY BOARD OF ERRONEOUS PAYMENT TO CONTRACTOR.—Where the board of directors of an improvement district paid the contractor from time to time for work done by the contractor upon estimates furnished by the engineer, and where the board seeks to recover payments made to the contractor on account of defective work done, the burden rests upon the board to show that the payments made were not due, and it can only recover to the extent that the payments were erroneous.

4. IMPROVEMENT DISTRICTS—PAYMENTS TO CONTRACTOR—DEFECTIVE WORK.—The contractor for an improvement district brought an action for a balance due it, and the board filed a cross complaint asking a recovery for sums erroneously paid the contractor for work improperly done, *held,* a judgment for the board will be reversed, where some of the charges for defects are sustained by the evidence and some are not, and the chancellor failed to make any specific finding.

5. CONTRACTS—USE OF MATERIALS—SUBSTITUTES—IMPROVEMENT DISTRICT.—Where there is a specific agreement for the use of certain kind of material, a contractor has no right to depart from that specification on the ground that he is furnishing something just as good. (Under the contract, *held,* the engineer of an improvement district was without authority to authorize a substitution of materials in the absence of consent by the board of directors).

6. IMPROVEMENT DISTRICTS—DEFECTIVE SPECIFICATIONS—ENGINEER'S DUTY.—In the construction of an improvement, where the specifications are defective, the directions of the engineer will control, in the absence of a showing of fraud.

Appeal from Cleburne Chancery Court; *G. T. Humphries,* Chancellor; reversed.

*Lemuel H. Doty* and *Rose, Hemingway, Cantrell, Loughborough & Miles,* for appellant.

1. The finding of the engineer is conclusive. 48 Ark. 522; 68 *Id.* 187; 79 *Id.* 513; 83 *Id.* 140, 142; 93 *Id.* 31-41. See also 212 U. S. 18; 3 Cyc. 621.

2. The damages awarded are excessive. 33 Ark. 751; 64 *Id.* 35; 67 *Id.* 219.

3. The sureties were discharged by modification of plans and contract. 6 Cyc. 82; 120 Ark. 527.

*George W. Reed* and *Williams & Seawel*, for appellees.

1. The court did not err in finding for appellees upon the merits and they were entitled to judgment. The funds of the district were obtained by appellants illegally and without legal authority. The contracts were not legal and binding because the board had not formed any plans for improvement, nor obtained the approval of the State Board of Health, etc., failed to require legal bonds; failed to establish what the plans and specifications contained; or if the contracts were legally entered into they were abandoned. Kirby & Castle's Dig., § 6836; 52 Ark. 511; 73 *Id.* 194; 69 *Id.* 159; 24 N. J. Eq. 143; 185 S. W. 474; 9 C. J. 772; 134 U. S. 260; 23 Ala. 622; 28 Iowa, 253; 88 Fed. 630; 124 Ark. 337; 92 *Id.* 254; 28 *Id.* 387.

After the removal of the commissioners by the council their power and authority ceased. 2 Dillon, Mun. Corp. (5 ed.), § 485; 127 Ark. 110. The institution of proceedings to quash the order of removal did not continue them in office. 28 Cyc. 448; 160 Ill. 550; 115 N. Y. Supp. 664. Their acts were void. 60 S. W. 5; 48 Me. 79; 28 Cyc. 421; 39 *Id.* 875. Appellants had knowledge of the removal order, and were charged with knowledge. 11 Cyc. 468; 28 *Id.* 646; 150 S. W. 498; 167 *Id.* 922; 137 *Id.* 237; 44 Ark. 437; 70 *Id.* 568; 39 *Id.* 580; 25 *Id.* 261; 114 *Id.* 289. They were not *de facto* officers. 15 Pac. 778; 69 Ark. 460; 45 *Id.* 478; 49 *Id.* 446; Cooley, Const. Lim., 61 S. W. 735; Mechem, Pub. Off. 328; 42 N. E. 184; 48 L. R. A. 412; 25 Atl. 977.

The order of the counsel was self-executing and not appealable. It could not be superseded. 31 S. W. 105; 57 N. W. 115; 63 Iowa, 711; 41 Ind. 356, etc. See also 19 Nev. 312; 10 Pac. 430.

The judgment of the circuit court in the *certiorari* proceedings was reversed by this court and even color of title was wiped out. 4 C. J. 1204; 86 Ark. 86; 54 *Id.* 239; 34 *Id.* 569; 29 *Id.* 85. See also 114 Ark. 289.

2.   The bondsmen are liable as aiders and abettors of the wrongful act. 25 Ark. 108; 38 Cyc. 485; 74 Atl. 1070; 234 Ill. 526.

3.   If authority legally existed for payment of the funds, appellant failed to perform the conditions. There was variance between the plans and the written specifications and the latter prevail. 9 C. J. 711; 129 Mass. 322; 64 N. Y. S. 848; 85 S. E. 513.

4.   Alexander could not bind the district—he had no authority to waive the requirements of the plans and specifications. The affairs of a corporation must be transacted by its officer directors at a corporate meeting. 64 Ark. 491; 85 S. E. 513; 24 N. J. Eq. 143; 19 *Id.* 376; 4 Elliott, Cont., § 614. See also 85 Atl. 513; *Ib.* 31.

5.   The engineer had no authority to authorize changes in plans and specifications. 34 Mo. App. 570; 100 Ark. 166; 22 N. Y. 162. The authority can not be delegated. 35 Ark. 198; 96 *Id.* 105; 70 *Id.* 352; 150 S. W. 498; 167 *Id.* 922; 137 *Id.* 237; 70 Ark. 568; 39 *Id.* 580; 114 *Id.* 289. Authority can not be inferred. 93 Ark. 600; 33 *Id.* 251; 44 *Id.* 213; 85 *Id.* 252. See 11 Ark. 705-710.

6.   The finding of the engineer is not conclusive. 48 Ark. 522; 100 *Id.* 284-295; 185 S. W. 474; 9 C. J. 755; 56 Ark. 205; 19 N. J. Eq. 376; 100 Ark. 166; 87 *Id.* 120; 127 *Id.* 110.

7.   The sureties were not discharged and the damages are not excessive. 9 C. J. 818; 97 Ark. 278; 79 *Id.* 513.

7.   Appellees were entitled to recover the full amount received by appellants from the district. 114 Ark. 289; 9 C. J., § 78; 157 Ill. App. 175; 149 *Id.* 646; 80 N. Y. S. 864; 14 S. W. 701; 70 Ark. 506. See also 24 N. J. Eq. 143; 102 Ark. 51; 64 *Id.* 34; 9 C. J. 741, § 79; 97 Ark. 278. The findings upon the merits should be affirmed and on cross-appeal appellees should recover.

The attorneys for appellants in reply.

The judgment below was binding until reversed on appeal. The old board was removed but the judgment was quashed. 80 Ark. 582. This court has power to maintain the *statu quo* by appropriate orders. 84 Ark. 404; 73 *Id*. 66. Appeal without supersedeas does not suspend judgment. 77 *Id*. 580. See also 69 Ark. 606.

The contracts were valid. 3 Ark. 571; 96 *Id*. 477; 30 *Id*. 69; 12 *Id*. 296; 24 *Id*. 431; 31 *Id*. 609; 110 *Id*. 515.

The damages are excessive. The correct rule is stated in 33 Ark. 751. See also 64 Ark. 35; 67 *Id*. 219.

McCULLOCH, C. J. An improvement district was formed in the town of Heber Springs for the purpose of constructing waterworks and sewers, and after the completion of the organization of the district the board of improvement let the contract for the construction of the improvement to appellant, Inland Construction Company, the contract price being the sum of $50,800 for the construction of the waterworks and $33,950 for the construction of the sewer system. The original contracts between appellant and the board of improvement were entered into on October 26, 1915, but the contracts were subsequently modified in certain respects by mutual agreement to meet the approval of the State Actuary Board and the State Board of Health. Before work was begun under the contracts, in fact before the above mentioned modification of the contracts was made, the town council of Heber Springs, after trial, removed the members of the board of improvement for alleged misconduct, but there was an application to the circuit court for writ of *certiorari* and the circuit judge in vacation granted an injunction restraining the new board of improvement elected by the town council from assuming the duties of the office in interfering with the discharge of those duties by the members of the old board and on the trial of the cause the circuit court quashed and set aside the order of the town council removing the members of the old board from office. An appeal was prosecuted to this court by the

mayor and other members of the town council and on January 22, 1917, this court rendered a judgment reversing the judgment of the circuit court and dismissing the writ of *certiorari.* The judgment of the circuit court was not, however, superseded during the pendency of the cause on appeal in this court, and the old members of the board of improvement who had been removed by the order of the town council, but restored to office by the judgment of the circuit court, continued to act as members of the board and thereafter entered into an agreement with appellant for a modification of the contracts for the construction of the improvement. Appellant proceeded with the work of constructing the improvement in accordance with the contracts, and the district paid to appellant as contractor from time to time on estimates of the engineers $50,549 on the price of the construction of the waterworks and the sum of $32,698.67 on the price of the construction of the sewer system, leaving a balance of $251 on the waterworks contract and $1,251.33 on the sewer contract. There was a final acceptance of the work by the engineer, but the acceptance was after the rendition of the judgment of this court dismissing the writ of *certiorari,* and after the new board had again assumed to act in that capacity, and refused to recognize the validity of the contracts of appellant or the authority of the engineer to represent the district.

Appellant instituted this action against the improvement district to recover the balance alleged to be due on the contract prices and the board of improvement filed a cross-complaint alleging that appellant had not complied with the contracts in many specified particulars and praying for a recovery of the amount paid under the contract. On the final hearing of the cause the court rendered a decree in favor of the board of improvement for recovery of $7,000 of the sum paid to appellant on the price of the waterworks and $21,000 of the sum paid on the price of the sewer system. Appellant prosecuted an appeal to this court and the board of improvement cross-appealed from that part of the decree refusing to award recovery

of the full amount paid to appellant by the district. The sureties on appellant's bond as contractor were joined as defendants in the cross-complaint and they, too, have joined in the appeal.

(1-2)    The first question to be disposed of is that raised by appellees concerning the validity of the contracts. It is claimed that the contracts are void because the members of the board of improvement were removed from office before the contracts became effective; that, as the binding force of the contracts is dependent on the authority of the members of the board at the time it was modified, and they were out of office and without authority at that time, therefore there was no valid contract. This contention narrows down to the question whether or not the old members of the board of improvement, notwithstanding their removal from office by the town council, were *de facto* members of the board after the circuit court assumed jurisdiction and rendered judgment restraining the new members of the board from interfering with the old members in the discharge of their duties and quashing the order of the town council. It is urged that the effect of the judgment of the circuit court was not to restore the old members of the board to office, but we are of the opinion that such was the necessary effect of that judgment. There was no formal judgment restoring to office the removed members of the board, but the order of the town council removing them was quashed and the injunction restraining the new members of the board from interfering with the old members in the discharge of their duties was tantamount to an express judgment restoring the latter to office.

It is further contended that the removal of the members of the board from office created a vacancy in each of the offices; that when the old members attempted to assume the duties of office again after the judgment of the circuit court in their favor they were mere usurpers, and for that reason can not be treated as *de facto* officers. Counsel for appellees invoke the application of the following rule stated by Judge Dillon in the last edition of

his work on Municipal Corporations, as follows (5 ed., vol. 2, sec. 485) :

"If the amotion be legal and authorized, the office becomes *ipso facto* vacant from the time the amotion is declared, and another person may be elected or appointed to fill it. If the removed officer afterward continues to act, he is a mere usurper."

' The present case does not come within that rule, which contemplates a complete removal of the incumbent from the office and the substitution therefor of his successor to fill the vacancy. In the present instance the effect of the judgment of the circuit court was to nullify, or at least to suspend the operation of the order of the town council, and this prevented the occurrence of a vacancy. The old members of the board, in continuing in office pursuant to the judgment of the circuit court, were not usurpers but were acting under color of title which made them *de facto* officers with whom all parties were authorized to deal as such without being required to investigate and ascertain their legal status as such officers. The rule which upholds the acts of *de facto* officers is one of public policy and those who deal with such officers in good faith are protected. Mechem on Public Officers, § 328; Throop on Public Officers, § 649; *Oliver* v. *Mayor of Jersey City,* 48 L. R. A. 412; *Woodside* v. *Wagg,* 71 Me. 207; *State* v. *Carroll,* 38 Conn. 449; *Petersilea* v. *Stone,* 119 Mass. 465; *Wilcox* v. *Smith,* 5 Wend. 232. The rule is stated by Mr. Throop as follows: "The exercise of a power by an officer *de facto* either judicial or ministerial, which lawfully pertained to the office of which he had possession, is valid and binding, where it is for the interest of the public, or of any individual, except the officer himself, to sustain the officer's act; but where the officer himself founds a right upon such exercise, either personally or officially, it is not valid in his favor." Mr. Justice Devens, speaking for the Supreme Judicial Court of Massachusetts in the case of *Petersilea* v. *Stone,* said: "Third persons, from the nature of the case, can not always investigate the right of one assuming to hold an important office, even as far as to

see that he has color of title to it by virtue of some appointment or election. If they see him publicly exercising its authority, if they ascertain that this is generally acquiesced in, they are entitled to treat him as such officer, and, if they employ him as such, should not be subject to the danger of having his acts collaterally called in question.'' In the recent case of *Faucette, Mayor,* v. *Gerlach,* 132 Ark. 58, we were called upon to apply the law as to the acts of a *de facto* officer to a different state of facts from those involved in the present case, but the doctrine is fully discussed in the opinion in that case, and we adhered to the rule announced by all the authorities that as to third persons the acts of a *de facto* officer are valid. The doctrine is applicable to the present case, and the contracts between the board of improvement and appellant were valid ones. It is not shown that there was any lack of good faith on the part of appellant in entering into the contracts with the old board, or in proceeding with performance during the pendency of the appeal in this court.

(3) Appellees also insist, in support of their cross-appeal, that if the trial court was correct in its findings of fact to the effect that appellant has not substantially complied with the contracts, and that final tests were made showing such compliance, then the decree should have been for recovery of the full **amount paid over to** appellant by the board on the ground that appellant can not sue under the contracts without having substantially performed them. That rule does not apply to recovery of payments made from time to time under a contract and the measure of appellee's cause of action, if entitled to recover at all, is the cost of completing the contracts, and the damage, if any resulted, from the failure of appellants to substantially perform the contracts. In other words, the payments being made according to the terms of the contracts upon estimates of the engineer, the burden rests upon appellee to make out its case by proving that the payments were not due, and can only recover to the extent that the payments were erroneous.

(4)   While appellant can not, in its own suit, recover the unpaid balance of the contract price when it is shown that it broke the contract by failing to comply with the terms, still in the suit of appellee to recover an amount sufficient to complete the construction according to contract, appellant is entitled to deduction of the unpaid balance of the agreed price.   This is so for the reason that if appellee is to recover a sufficient amount to complete the contract, appellant ought to be paid the full price.

It becomes necessary, therefore, for us to examine the testimony in the case in order to pass upon the correctness of the chancellor's finding on the question of performance of the contracts by appellant.   The allegations as to shortcomings and defects in the work done by appellant under the contracts are so numerous that it is impracticable to discuss every item in this opinion.

It is claimed that appellant failed to properly perform the waterworks contract in that they substituted 12,000 feet of two-inch galvanized water pipe instead of four-inch cast iron pipe called for in the specifications; that they failed to construct the two storage reservoirs in accordance with the contract in that reinforcing material specified was not used so as to make the structures safe; that the pump house was not built in accordance with the contract in that water-proofing material was not used as specified, nor was the proper reinforcing material used; that valves on the water mains were not put in as specified; that the hydrants were placed on the opposite side of the street from the location specified in the plans; that much of the pipe was not laid deep enough and that much of it was not properly protected at crossings of streams.   The allegations as to the defects in the sewer system were equally numerous and embraced the charge that 600 feet of sewer pipe according to the plans were entirely omitted; that the sewer pipe was not properly laid, there being numerous specifications as to the defects in that respect; that the disposal plant, the dosing tank, sludge beds and contact beds were not constructed in accordance with the plans and specifications.   It is claimed

that neither the waterworks nor the sewer system was sufficient to stand the test made in accordance with the specifications of the contracts.

We have reached the conclusion, after careful consideration of the record, that some of the charges as to defects are sustained by the evidence, but that many of them are not sustained by the evidence, and inasmuch as the chancellor did not make any specific findings of facts, and the evidence is not sufficient to afford means of separating the items and ascertaining the costs of correcting the defects in the construction, a reversal of the decree must necessarily result.

We are of the opinion that the charge of wrongful substitution of two-inch galvanized pipe for four-inch cast iron pipe is not sustained by the evidence. There is a controversy as to what the plans show. The first page of the plans, which contains the pipe layout, according to the terms used by the witnesses, is missing from the set of plans now in the possession of the present board of improvement. A witness introduced by appellant identified the set of plans used by appellant in carrying on its construction work from day to day and the witness also testified that those plans were exactly like the set of plans on file in the office of the State Actuarial Board. Other evidence adduced shows that the contract was modified to meet the approval of the Actuarial Board and the engineer of that board testified as a witness in the case. He was not examined concerning the authenticity of the set of plans on file in the office of that board, but it was assumed that the plans presented to that board for approval were the ones which represented the contract between the board of improvement and appellants. The testimony was sufficient to show that the set of plans introduced in evidence, including the first page which was missing from the set of plans in the hands of the board of improvement, was a true copy of the plans which had been agreed upon in the contract between the board of improvement and appellant. If that is correct, then it must be taken as undisputed that the plans themselves called for the quantity of

two-inch pipe which appellant used in constructing the waterworks. It is insisted in the argument here that even if two-inch pipe was to be used, it should have been standard cast iron pipe instead of galvanized iron pipe, but that was not the theory upon which the case was tried in the court below, and an examination of the record shows that the issue which the parties fought out below was whether two-inch galvanized pipe was to be used or four-inch cast iron pipe. The other pipe used was six and eight inch cast iron pipe, and there is no controversy about that feature of the case. In other words, the controversy below was whether or not any two-inch pipe at all was to be used, and whether appellants should not have used the four-inch cast iron pipe in the places where they used two-inch galvanized pipe. A reading of the testimony as drawn out on the examination of certain witnesses and the cross-examination by counsel for appellees, shows conclusively that they were resting their case, so far as this feature of it is concerned, upon a showing that four-inch pipe ought to have been used instead of two-inch. They contend here also that the specifications called for cast iron pipe throughout and invoke the rule that where there is a conflict between the specifications and the plans, the former must control. We do not think, however, there is a necessary conflict between the plans and specifications. The plans are very definite and certain in showing that about 12,000 feet of two-inch pipe was to be used. There is no uncertainty or ambiguity in the plans themselves on that point. The specifications with reference to cast iron pipe were only intended to point out the character of that material so far as it was to be used, and it was not necessarily a specification that all of the pipe must be of the certain kind mentioned. In other words, it is only a specification as to the cast iron pipe so far as the contract called for its use. It specified that all cast iron pipe should be moulded in a certain way and of a certain type and should be in sizes of four, six and eight inches in diameter, which leaves a fair implica-

tion that if any other sized pipe was to be used it was not to be of that kind.

Our conclusion on this point is that if the chancellor found with appellees on this point he erred, for the evidence does not sustain the charge that there was a wrongful departure from the contract and a substitution of another kind and size of pipe for that mentioned in the contract.

The ground of the next charge of violation of the contract is concerning the construction of the two concrete storage reservoirs for the waterworks. It is contended that the contract was not complied with as to the reinforcing material used and that the reservoirs are defective on that account and will probably not withstand the pressure and weight they are intended to bear. The proof establishes the fact that appellant used ordinary fence wire for reinforcement of the concrete work, notwithstanding the fact that half-inch steel bars were to be used. On the other hand, appellant contends that the only specification on that subject is that the walls of the reservoirs "shall be reinforced to the satisfaction of the engineer." There is a conflict in the testimony as to what the specifications in this respect are. The specifications read (in part) under the head of "Storage Reservoirs" as follows:

"There shall be constructed at a site to be acquired by the city, two storage reservoirs, circular in form, having a diameter of sixty (60) feet and a depth of eleven (11) feet. All work shall be done in a neat and workmanlike manner. All material to be of the kind and quality specified under materials, and work shall be done in all respects as called for in the plans and specifications. These reservoirs shall each have a capacity of approximately 240,000 gallons to the water line; the bottom of the reservoir shall not be more than six inches below the original surface of the ground." Under the subheading of walls there is a sentence as follows: "Walls shall be reinforced to the satisfaction of the engineer."

(5)    The contention of appellant is that this is the only specification that controls, and that the walls and floors of the two reservoirs were constructed with respect to the use of reinforcing material, as well as in all other particulars, to the satisfaction of the engineer and under the latter's direction.    This is not, however, all that the record shows with respect to the specifications concerning reinforcing material.    The testimony shows that the plans or blue prints were submitted to the State Actuarial Board and that on the page showing the two storage tanks the engineer of that board made an endorsement requiring that the reinforcing material should be "half-inch C. I. bars, spaced twelve inches on center in vertical walls of tank and three-quarters-inch C. I. bars in bottom of tanks or reservoirs."    Afterwards the contract was modified so as to conform to the requirement of the engineer of the State Actuarial Board.    The modification was expressly agreed to by appellant and became the controlling part of the contract as to this feature of the work. The preponderance of the evidence is in favor of the contention of appellees on this point; at least, it does not appear that the finding of the chancellor was against the preponderance of the evidence.    As between this definite specification concerning the particular kind of reinforcing material to use and the more general specification in the original draft, the former must control because the two may be entirely reconciled by construing the original specification about reinforcing the walls "to the satisfaction of the engineer" to mean that the kind and size and quality of reinforcing should be used as specified and that it should be done to the satisfaction of the engineer.    There is a conflict in the testimony as to whether it is really necessary to use reinforcing material of that kind, and whether or not the use of ordinary fencing wire was sufficient to give the floors and walls of the reservoirs sufficient strength.    Some of the engineers who testified on the subject say that concrete work of that kind will not withstand the required pressure without being reinforced as specified in the contract, while others say that

the use of the wire is just as good.   Conceding that it is very uncertain that the concrete work will prove to be defective on account of the use of insufficient reinforcement, and that it may fully serve the purposes intended and afford safe receptacles for the water to be stored from year to year, still the improvement district contracted for the use of a certain kind of material, and it is no answer to say that something has been furnished which may prove to be just as good and sufficient for the purpose.   Where there is a specific agreement for the use of certain kind of material, a contractor has no right to depart from that specification on the ground that he is furnishing something just as good.   In other words, the contracting party is entitled to have what he calls for in his contract.   The substitution of reinforcing material was, according to the testimony, a substantial departure from the specification of the contract, and that departure from the contract was entirely unauthorized.   The engineer had no right to agree to such a change, and there is no proof showing that the change was authorized by the commissioners. The contract expressly provides that any changes in the contract must be authorized by the board of improvement and, as before stated, it does not appear that any such authority was given.

(6)   It is also contended that the same specification with respect to reinforcement of the concrete work applies to the pump house building and two other tanks or reservoirs designated as the Clear Water Reservoir and the Coagulation Tank, but we do not find any such specification with respect to the construction of those portions of the work.   They are on different sheets of the plans, and the notation of the engineer of the State Actuarial Board only applies to the single sheet covering the two storage tanks.   In the absence of a more definite specification the direction of the engineer as to the method of constructing the concrete work controls when there is no showing of any fraud or misconduct on the part of the engineer.   In cases where no particular kind of material was specified it was the duty of the engineer to point out the kind to use,

and the proof shows that these structures were put up under the direction of the engineer in charge and that the work met his approval. The same may be said with regard to what is called the water-proofing material.

Our conclusion, therefore, is that the two storage reservoirs were not built in accordance with the contract, and that appellees are entitled to recover the cost of reconstructing them in accordance with the specifications; but that as to the other structures named above, the contract must be treated as having been complied with under the direction of the engineer. We deem it unnecessary to discuss any other items in connection with the waterworks, but it is sufficient to say that we do not think the testimony sustains any other charge than as to the two storage reservoirs.

Now the principal charge concerning the failure to comply with the contract for the construction of the sewer system is that 600 feet of the sewer line was entirely omitted, but we do not think that the testimony sustains that charge. The evidence shows that there was a change in the plans which permitted the omission of the line of sewer mentioned and the substitution of another line, and that this change was authorized by the board. Another charge is that there is a defect in failing to construct the cover for the sedimentation tank of the sewer system designated in the specifications as the Imhoff tank. Appellant answers this by saying that there is no direct specification that the tank is to be covered, and this seems to be true; but it seems inconceivable that a tank of this kind should be left exposed without a cover to it, and we conclude from a very careful consideration of the specifications on this subject, which are quite lengthy, that the cover was really contemplated. The testimony preponderates very heavily in favor of the theory that it is essential for sanitary reasons that the tank should be covered and that there is a defect in this respect in the construction of the work by appellant.

We have also reached the conclusion that the testimony warranted the findings that the contract for the con-

struction of the sewer system was not complied with in regard to certain other items, or rather we can not say that the preponderance is against the findings of the chancellor on those items, as follows:

The specifications called for reinforcement with three-eighth-inch square steel bars of the concrete trough leading from the receiving manhole to the Imhoff tank, and that as a result of not constructing the trough in that manner it cracked open and became useless. The specifications called for construction of the gas baffle and vent stack of the Imhoff tank out of concrete over twenty-eight-inch gauge, self-centering, and the construction was not done in that manner. The specifications called for a four-inch concrete wall on the inside of the stone wall of the contact bed, and the proof shows that the concrete wall was not built. The specifications called for an eight-inch outlet from the lowest manhole to the sludge bed, and the proof is that only a three-inch outlet was constructed.

There are many other charges concerning this work, but we do not think that any of them are sustained by the testimony. It would unduly prolong this opinion to discuss them in detail. Some of the matters are quite trivial and others of very grave importance, but it does not appear to us that any of the charges are sustained.

It is further contended by appellants that the sureties on the bond are not liable for the reason that there was a modification of the contract without their consent, but we find that the bond was executed after the contract was modified, and that the undertaking of the sureties was to guarantee the performance of the contract as modified.

The decree will be reversed, but we are unable to ascertain from the testimony the cost of reconstructing the two storage reservoirs and of constructing the cover for the Imhoff tank and the other items specified above as not being in compliance with the contract, so it will be necessary to remand the cause for further proceedings.

It is ordered that the decree be reversed and the cause remanded with directions to hear further proof as to the cost of completing the contract with respect to the items mentioned above, and to enter a decree in favor of appellees against appellants for the amount of such cost after allowing appellants credit for the balance due on the contract prices.