BARTRON, Appellant, v. CODINGTON COUNTY, Respondent

CODINGTON COUNTY, Respondent, v. BARTRON, et al, Appellants

(2 N. W.2d 337.)

(File Nos. 8408, 8409, 8410. Opinion filed February 9, 1942.)

Rehearing Denied March 23, 1942.

312

**Davenport & Evans,** of Sioux Falls, for Appellant.
**Alan L. Austin,** of Watertown, for Respondent.

SMITH, J. The above entitled companion causes have a single factual background and confront us with common and related contentions. To avoid repetition, we have determined to dispose of the issues presented therein by a single opinion.

The facts as found by the learned trial court are not in dispute. The assignments only question the sufficiency of the facts thus found to sustain the conclusions of law and judgment. The central question of law to be determined is whether certain exhibited bargains between Codington County and the Bartron Clinic, a corporation for profit, pursuant to which such corporation furnished medical and surgical services, and medicines to the county indigent, are illegal and unenforceable.

The "Bartron Clinic" was incorporated in February of 1929, "to conduct and operate a general medical and surgical hospital and clinic and employ duly licensed physicians,

surgeons, nurses, students, and other persons to carry on the business of said corporation." Its 750 shares of capital stock were originally issued and held by duly licensed physicians and surgeons, and by nurses and other employees of the corporation. During the period of time at issue in these causes, only 28 of its shares were held by Joyce H. Williams, a lay person. The remaining shares were held by Dr. Bartron and Dr. Brown until 1936, and thereafter by Dr. Bartron. Joyce H. Williams was secretary of the corporation and served on its board of directors. It operated a hospital and clinic at Watertown until May 1, 1937. Thereafter, until June 15, 1938, it confined itself to a general medical and surgical practice, in connection with which it furnished its patients medicine. On that date it discontinued its business, and was formally dissolved later in that year. The stockholders of the corporation were bound by formal contracts to offer their stock to the other stockholders at a price fixed therein, before selling it to strangers.

Except for some minor services of an intern, all of the professional services involved herein were performed by duly licensed physicians and surgeons employed at fixed salaries by the corporation, and all charges therefor accrued to and were made by the corporation. The corporation owned all equipment used by the doctors and maintained the supply of drugs furnished patients. The corporation did not hold a license to practice medicine and surgery, nor to operate a pharmacy.

On January 3, 1933, the county and the corporation executed and delivered two contracts in writing wherein the corporation agreed to furnish hospitalization, medical and surgical services and medicine to the county for its poor persons. These contracts were renewed from year to year until 1937. In February of that year a like contract was executed and delivered between the parties to which all of the physicians employed by the corporation were added as parties. In February of 1938 a similar contract was made but was executed on the one side by Dr. Bartron. The court found that this contract signed by Dr. Bartron "was made

solely for and on behalf of the corporation and with intent that the same was to be performed by the corporation." The professional services and medicines furnished the county were rendered under these contracts. The court found "that the said doctors employed by the Bartron Clinic rendered the services performed for the poor patients of Codington County, as charged for in said claims as salaried employees of Bartron Clinic, the corporation, and not otherwise, and solely for and on behalf of said corporation, and pursuant to their employment for such purpose by Bartron Clinic."

The court further found that there was not in connection with the organization of the Bartron Clinic, or at any time thereafter, any purpose or intent whatsoever on the part of Dr. Bartron or anybody else connected with said corporation to place the actual control of the practice of medicine with any person other than duly licensed physicians; that there was not at any time throughout the existence of said corporation any control, or effort to exercise control, as to the actual practice of medicine on the part of anybody other than a licensed physician and no interference, or attempted interference, by anybody other than a licensed physician, with the actual practice of medicine; that the actual purpose and intent of Dr. Bartron in promoting the organization of said corporation was to establish what amounted to a system of profit sharing, whereby the prominent and leading employees of said hospital and clinic business would have some actual interest in the success thereof.

Case No. 8408 originated as a claim before the county commissioners in aggregate amount of $3,649.63 for medicine supplied the county indigent between January 1, 1938 and September 1, 1938. The claim was allowed by the commissioners for $2,044.50. This claim involved some medicines supplied by Dr. Bartron personally after the corporation discontinued business on June 15, 1938. Upon appeal to the circuit court after a trial de novo, the circuit court disallowed the claim insofar as it included medicines furnished by the corporation. The argument presented in this

particular appeal only challenges the propriety of the ruling of the court on the validity of the original claims.

Case No. 8409 originated as an action against the county on five county warrants aggregating $6,588.20 issued by the county pursuant to allowance by the board of commissioners of claims of the Bartron Clinic for professional services and medicines. The claims under which these warrants were issued included items totaling $779.10 for X-Rays, glasses, and an item of hospitalization. These items were not contested by the county. The court disallowed all other items for professional services and medicines.

Case No. 8410 originated as an action by the county to recover $47,000 paid out on claims of the Bartron Clinic for professional services and medicines furnished the poor of Codington County during six years immediately preceding the commencement of the action. The trial court found for the county and entered judgment against the defendants for $29,220.37. The findings disclose that the county received and retained the professional services and medicines for which these payments were made. The circuit court concluded that this fact did not bar the right of the county to claim full restitution.

In all of the described cases the court found that the professional services were actually rendered by duly licensed physicians, except for a small item for intern's services, and that the medicines were prescribed by such physicians in treatment of the county poor, and that all of this was done pursuant to directions and orders of the county commissioners.

The court concluded as a matter of law in each case that it is unlawful and contrary to public policy for a corporation to practice medicine or surgery and to operate a pharmacy or sell medicine without a license as required by the statutes of South Dakota. These conclusions are challenged here by appropriate assignments of error.

█ Is the practice of medicine and surgery for gain by a corporation prohibited by statute? That in the exercise of police powers of the state the Legislature can prohibit

corporations from engaging in the business of supplying the services of licensed physicians and surgeons for gain is conceded. The question is whether the Legislature has intended to exercise the power so to do.

The statute presented for interpretation and construction, Section 7717, Rev. Code of 1919, reads as follows: "Any person who shall practice medicine, surgery, obstetrics, or any of the branches thereof in this state without having obtained a license and caused the same to be recorded as required by this article; or who shall submit to the state board of health any false, forged or fraudulent diploma, or one of which he is not the lawful owner, or any false or forged affidavit of identification, for the purpose of obtaining from such board any license required by this article; or who shall file or attempt to file with the register of deeds of any county in this state any such license belonging to another, representing the same to be his own, or any such license issued to another having the name of the person to whom it was issued erased therefrom and his own name, or the name of another, inserted in its place, or who shall falsely personate anyone to whom such license has been issued, shall be deemed guilty of a misdemeanor."

The section originated as part of Chapter 109 of the Session Laws of 1913. At the times in controversy that act had been re-enacted as a part of the Revised Code of 1919. Our references are to the revision.

The act created a state board of health with power to license and regulate the practice of medicine and surgery within this state, as well as with other powers related to the public health. Sections 7663 and 7667, Rev. Code of 1919. "Any person desiring to engage in the practice of medicine, surgery or obstetrics in any of their branches" was directed to make application to that board for a license and it was provided that a "license shall be granted to any applicant who shall give satisfactory proof of being at least twenty-one years of age, of good moral character, * * * upon compliance with the following conditions: * * *." The conditions set forth included the passing of described examinations,

presenting for inspection the diploma of graduation from an approved medical college, presenting evidence of having served as intern in a standard hospital or of having equivalent experience satisfactory to the board. Section 7705, Rev. Code of 1919, as amended by ch. 254, Session Laws of 1925. Unprofessional, immoral or dishonorable conduct was fixed as a ground for refusal of a license. Section 7709. Like conduct, and certain public deceptions with reference to cures or treatments of diseases, injuries or deformities, and gross incompetence, and conviction of a felony, were listed as grounds for authorizing revocation of a license by the board. Section 7710. The phrase "unprofessional conduct" was defined in Section 7711 as follows:

"1. Producing or aiding or abetting a criminal abortion.

"2. Employing what is known as cappers or steerers.

"3. Obtaining any fee on the assurance that a manifestly incurable disease can be permanently cured.

"4. Wilfully betraying a professional secret.

"5. All advertising of medical business in which untruthful or improbable statements are made or which are calculated to mislead or deceive the public.

"6. All advertising of any medicine or means whereby the monthly periods of women can be regulated or the menses restablished, if suppressed.

"7. Conviction of any offense involving moral turpitude.

"8. Habitual intemperance.

"9. Refusal or neglect to report the existence of a diseased or unsanitary condition to the proper health authorities, as prescribed by the regulations of such board.

"10. Prescribing intoxicants to any person in quantities, and under circumstances making it apparent to the board that such prescription was not made for legitimate medicinal purposes.

"11. Splitting fees or giving to any person furnishing a patient any portion of the fees received from such patient or paying or giving to any person any consideration whatever for furnishing any patient."

"Every person receiving a license to practice" is required to "record the same in the office of the register of deeds of the county where he resides and is engaged in practice, * * *." Section 7712. An additional license was required for "itinerant physicians" and it was provided that "Any person practicing medicine, surgery or obstetrics in any of their branches as an itinerant physician, * * * without having procured such itinerant license, shall be guilty of a misdemeanor * * *." Sections 7713 and 7714. By Section 7715 it was provided: "Any person who shall append or prefix the letters M.B. or M.D., or the title of Dr. or Doctor, or Specialist, or any other sign or appellation in a medical sense, to his name, or shall profess publicly to be a physician or surgeon, or who shall recommend, prescribe or direct for the use of any person any drug, medicine, apparatus or other agency for the cure, relief or palliation of any ailment or disease of the mind or body, or for the cure or relief of any wound, fracture or bodily injury or deformity, after having received or with the intent of receiving therefor, either directly or indirectly, any bonus, gift or compensation, shall be regarded as practicing within the meaning of this article." The section we are to interpret, which we quoted in full at the outset, then appears as section 7717.

The county bases its contention that the Bartron Clinic violated section 7717, supra, on the general rule of statutory construction, which explains that the word "person" when used in our statutes signifies a "corporation" as well as an individual "except when a contrary intention clearly appears." Section 18, Rev. Code of 1919. It reasons that supplying the professional services of licensed physicians and surgeons for gain constitutes practicing as defined by section 7715, supra, and that as the corporation could not qualify for a license and in fact held no license, it must be held to have violated the section we are to interpret.

There is no doubt that, assigning to the word "practice" the broad signification of common usage, this corporation, functioning through licensed practitioners who acted within

the scope of their authorized powers, practiced medicine and surgery. Neither can it be doubted that separately read Section 7717 conveys the meaning assigned to it by the county when its words are understood in their ordinary sense. It follows that we are required to place such an interpretation upon the section unless a different legislative intent is otherwise plainly revealed.

■■ The true intention of the Legislature must be gathered from placing this section in its setting and reading the act as a whole. When that is done, the most cursory analysis of the act reveals that it was motivated by a purpose to bring a high standard of character and competence to the work of diagnosis and treatment of human disorders, and the correlative purpose of preventing the quack and unfit from ministering unto the bodily ills of mankind. To accomplish these purposes a system of licensing was set up based on personal qualifications including age, character, schooling, training and professional conduct, and a penal provision was added to the act to deter the unfit from treating patients. Throughout the body of the act the Legislature has dealt with the functions of natural persons and has ignored their legal relationships. Although it seeks to regulate the conduct of those who are licensed, by the device of defining unprofessional conduct, Section 7711, and providing for the revocation of a license of one found guilty of such unprofessional conduct, it is noticeable, and not without significance in measuring the scope of the legislative intention, that it has not included practice for gain as the employee of an unlicensed individual or corporation in its definition of unprofessional conduct. An intention to regulate the employments of the licensee is not manifested by the body of the act. It is also to be observed that the Legislature had a limited concept in mind when it used the term "practice". It did not accept the broad definition of the lexicons. The definition of that term incorporated into the act embraces but two categories of individual conduct having a direct relation to a purpose to deal with the actual treatment of patients, viz., (a) individual professions of qualifica-

tion to treat, or (b) actual treatment for gain. Section 7715, supra.

The conclusion is irresistible that the body of the act reflects but the correlative purposes to which we have adverted. A conclusion that the Legislature intended to deal with the related but distinct object of preventing unlicensed persons from engaging in the business of supplying the services of the licensed practitioners must be predicated solely upon the supplementary penal provision.

██ A casus omissus cannot be supplied by the court. We are interpreting a penal provision. No act or omission is deemed criminal unless so declared by statute. Section 3570. Penal statutes are to be construed according to the fair import of their terms, with a view to effect their objects. Section 3577. In our opinion the fair import of the words of the provision we are interpreting may only be understood by reading the act as a whole. When that is done it becomes obvious that the object to be effectuated by legitimate interpretation is that of excluding all but those of duly attested qualifications from directly ministering unto the human disorders. An interpretation of Section 7717 as prohibiting individuals from practicing, as that term is defined in Section 7715, supra, renders that object completely effective and involves no absurdity. To interpret the act in accordance with the views advocated by the county outruns the revealed intention of the Legislature and directs its penal provision, so obviously intended to exclude the unfit, at the duly licensed practitioner. Under that interpretation a licensed practitioner who exercises his skills for gain as the employee of an unlicensed individual or corporation would be guilty of the crime of "practicing without a license." We are persuaded that the prevention of corporate practice was not in contemplation by the Legislature when it enacted these provisions, and that it may not be brought within the prohibition of Section 7717 by legitimate interpretation. It follows that we are of the opinion that the Bartron Clinic did not bargain to do that which is prohibited by the provisions of the Medical Practice Act.

A similar problem of construction came before the King's Bench of the High Court of Justice in the case of Law Society v. United Service Bureau, Limited, [1934] 1 K. B. 343. The statute there interpreted read "any person, not having in force a practising certificate, who wilfully pretends to be * * * qualified * * * to act as a solicitor" shall be liable to a penalty. The court stated the problem as follows: "The question whether the expression 'any person' in s. 46 of the Solicitors Act, 1932, includes a corporation or a limited company involves the further inquiry, under s. 2 of the Interpretation Act, 1889, whether there is in the Act anything which would indicate a contrary intention." In response to that question it said:

"In my view, the words in s. 2 of the Interpretation Act, 1889, 'unless the contrary intention appears,' merely embody the principle laid down by the House of Lords in Pharmaceutical Society v. London & Provincial Supply Association [1880, 5 App. Cas. 857]. (1) Lord Selborne L. C. there said (2): 'I think the principle laid down by the junior counsel for the respondents was substantially right; that if a statute provides that no person shall do a particular act except on a particular condition, it is, prima facie, natural and reasonable (unless there be something in the context, or in the manifest object of the statute, or in the nature of the subject-matter, to exclude that construction) to understand the Legislature as intending such persons, as, by the use of proper means, may be able to fulfil the condition; and not those who, though called "Persons" in law, have no capacity to do so at any time, by any means, or under any circumstances, whatsoever.' That principle is very succinctly stated by Lord Blackburn in applying it to the Act which was then under discussion. He said (3): 'The Act then goes on, in the first section, which is I think really very important, to say that "it shall be unlawful for any person to sell or keep open shop for retailing, dispensing, or compounding poisons, or to assume or use the title of chemist and druggist, or chemist or druggist, or pharmacist, or dispensing chemist or druggist, in any part of Great Britain, unless such per-

son shall be a pharmaceutical chemist, or a chemist and druggist." Now, my Lords, standing there, it does seem to me, though without laying down any technical rule, that the plain meaning of the words is, and they are used in this sense—such a person as could become a pharmaceutical chemist. A corporation could not; an individual can. It seems to me, therefore, that the Act plainly says in the first section, "It shall be unlawful to sell or keep open shop or assume the name of a chemist or druggist for any person," that is to say, any natural person, "unless he becomes a pharmaceutical chemist." '

"Applying the principle there laid down, it seems to me that s. 46 of the Solicitors Act, 1932, must be held to contemplate a person who can have in force a practising certificate as a solicitor."

We are not unmindful of the fact that American courts whose opinions merit the utmost of respect have interpreted similar licensing acts in accordance with the views advocated by counsel for the county. For exemplifications of such interpretations see People v. John H. Woodbury Dermatological Institute, 192 N. Y. 454, 85 N. E. 697; State v. Bailey Dental Co., 211 Iowa 781, 234 N. W. 260; People v. Painless Parker Dentist, 85 Colo. 304, 275 P. 928; and for a criticism of that view see 48 Yale Law Journal 346.

■ Is the corporate practice of the learned professions for gain contrary to public policy? Public policy is that principle of law which holds that no person can lawfully do that which has a tendency to be injurious to the public or against the public good. 17 C. J. S., Contracts, § 211, p. 563; Minnesota, D. & P. Railway Company v. Way et al., 34 S. D. 435, 148 N. W. 858, L. R. A. 1915B, 925; Moore v. Hyde, 39 S. D. 196, 163 N. W. 707. In a scholarly treatise entitled "Public Policy in the English Common Law", 42 Harvard Law Review 76, Dr. Percy H. Winfield suggests that public policy is "a principle of judicial legislation or interpretation founded on the current needs of the community." In exercising their legitimate functions we think courts do no more than declare the existence of a policy revealed to them by a

process of interpretation. This they do as Dr. Winfield has so aptly suggested, to safeguard "that which the community wants" and not "that which an ideal community ought to want." Manifestly, the principle may not be invoked by the judges of a court to promote their private notions of good or expedient policy.

■■ That a policy reflected by the established trend of constitutional or statutory provisions, or of the decisions of the courts, or of administrative practices, is public in character, is generally accepted. 12 Am. Jur. 668. After a broad review of the adjudications of the courts, we deem it unwise to attempt to limit the sources we may consult in determining whether a policy has become fixed in the community mind or conscience. Until firmly and solemnly convinced that an existent public policy is clearly revealed, a court is not warranted in applying the principle under consideration. It has been well said, "that the right of private contract is no small part of the liberty of the citizen, and that the usual and most important function of courts of justice is rather to maintain and enforce contracts than to enable parties thereto to escape from their obligation on the pretext of public policy, unless it clearly appear that they contravene public right or the public welfare." Baltimore & Ohio Southwestern Railway Co. v. Voigt, 176 U. S. 498, 20 S. Ct. 385, 387, 44 L. Ed. 560.

■ When conduct opposed to the public interest is made the subject of a bargain the courts ordinarily refuse to accord a party thereto a remedy predicated thereon. Restatement of the Law of Contracts, § 598; Williston on Contracts, Rev. Ed., § 1630.

The subject of practice of the learned professions by a corporation has been under consideration by the courts in a variety of actions and proceedings. Causes dealing with the practice of medicine and dentistry are collected in 103 A. L. R. at page 1240, and those dealing with the practice of law are collected in 73 A. L. R. at page 1327. While decision has rarely turned on the naked issue of public policy, the expressions of the courts indicate a current of opinion, to

which there are but few dissentients, that such practice contravenes the public interest and is contrary to public policy.

The leading case is that of In re Cooperative Law Co., 198 N. Y. 479, 92 N. E. 15, 16, 32 L. R. A., N. S. 55, 139 Am. St. Rep. 839, 19 Ann. Cas. 879. The Court said: "The practice of law is not a business open to all, but a personal right, limited to a few persons of good moral character, with special qualifications ascertained and certified after a long course of study, both general and professional, and a thorough examination by a state board appointed for the purpose. * * * The relation of attorney and client is that of master and servant in a limited and dignified sense, and it involves the highest trust and confidence. It cannot be delegated without consent, and it cannot exist between an attorney employed by a corporation to practice law for it, and a client of the corporation, for he would be subject to the directions of the corporation, and not to the directions of the client. There would be neither contract nor privity between him and the client, and he would not owe even the duty of counsel to the actual litigant. The corporation would control the litigation, the money earned would belong to the corporation, and the attorney would be responsible to the corporation only. His master would not be the client but the corporation, conducted it may be wholly by laymen, organized simply to make money and not to aid in the administration of justice which is the highest function of an attorney and counsellor at law. The corporation might not have a lawyer among its stockholders, directors, or officers. Its members might be without character, learning or standing. There would be * * * no stimulus to good conduct from the traditions of an ancient and honorable profession, and no guide except the sordid purpose to earn money for stockholders. The bar, which is an institution of the highest usefulness and standing, would be degraded if even its humblest member became subject to the orders of a money-making corporation engaged not in conducting litigation for itself, but in the business of conducting litigation for others.

**The degradation of the bar is an injury to the state."** (Emphasis supplied.)

In United States Title Guaranty Co. v. Brown, 86 Misc. 287, 149 N. Y. S. 186, 188, it was said: "The profession of the law, one of the oldest known to civilization, involving the most sacred confidence between man and man, with its past of high ideals and service to humanity, has in the last quarter of a century suffered much from the inroads of the new financial and business methods in this great land of ours. Whether by ill-advised attempts by corporate employers to dominate and direct attorneys and counsel in the conduct of litigation, whether by so-called title companies or casualty insurance corporations, the old ideals in the relation of attorney and client, which meant so much to mankind, have suffered and have been threatened with demoralization. This is wrong. The loss of the individual personal relation involved in the attempt by corporations to practice law is so serious to the community that it is against public policy, and I am inclined to think malum in se * * *."

In People ex rel. State Board of Medical Examiners v. Pacific Health Corporation, 12 Cal.2d 156, 82 P.2d 429, 430, 119 A. L. R. 1284, the opinion states: "Defendant suggests that the Medical Practice Act should be strictly construed so as not to prohibit its activities; but this argument ignores the basic policy of the law, of which the statute is merely declaratory, against corporate practice of the learned professions, directly or indirectly."

Iterman et al. v. Baker, 214 Ind. 308, 15 N. E.2d 365, 369, contains the following language: "Under the statutes of this state it has never been doubted that it is unlawful for a corporation to practice medicine, and any contract made in the name of a corporation, binding it to diagnose or treat ailments or diseases, is not only ultra vires, but unlawful and against public policy."

In State v. Bailey Dental Company, 211 Iowa 781, 234 N. W. 260, 262, we find the following: "* * * there are still other reasons of public policy why mere corporations might be barred from entering this field. There are certain

fields of occupation, which are universally recognized as 'learned professions.' Proficiency in these occupations requires long years of special study and of special research and training and of learning in the broad field of general education. Without such preparation proficiency in these professions is impossible. The law recognizes them as a part of the public weal and protects them against debasement and encourages the maintenance therein of high standards of education, of ethics and of ideals. It is for this purpose that rigid examinations are required and conducted as preliminary to the granting of a license. The statutes could be completely avoided and rendered nugatory, if one or more persons, who failed to have the requisite learning to pass the examination, might nevertheless incorporate themselves formally into a corporation in whose name they could practice lawfully the profession which was forbidden to them as individuals."

These views are reflected elsewhere.

"A contract made in the name of a corporation binding it to diagnose or treat ailments or diseases is ultra vires, unlawful, and against public policy." 19 C. J. S., Corporations, § 956, p. 410.

"A corporation has no right * * * to engage in the practice of the law. Public policy forbids such practice and it is malum in se." Fletcher, Cyc. of Corporations, Vol. 6, § 2524.

Debasement of the learned professions is in fact inimical to the public welfare. The public is the ultimate beneficiary of its professional social organisms, and of the private, as well as of the unselfish public, exercise of the skills and talents of its professional practitioners. Although the members of the legal profession in their individual capacities as officers of the courts of justice sustain a relationship to the public without parallel in the medical professions, in all other respects the services of the two professions are of equal importance to the public, and debasement of the one, in our opinion, would constitute no less a public evil than would the degradation of the other.

These professions, as they exist in our social structure, rest upon a foundation of sturdy, sterling human character which, in turn, has been and is being shaped and moulded by the impact of traditional ideals and points of view. The licensing statutes with their emphasis on character and professional conduct evidence a fixed public desire and will not only to foster, but to develop and reinforce, these basic attributes of its professional servants. The constant trend of public demand, as exhibited by these licensing statutes, is for mounting standards, a more painstaking investigation of the character and professional conduct of applicants for entrance into these regulated fields, and a more constant vigilance in observing the conduct of those to whom the privilege of practice has been granted. Manifestly, that which has a tendency to blight the character or lower the standards of the business or professional practice of these individuals would be in contravention of the public aspirations so clearly reflected in the licensing statutes. Thus we conclude that debasement of the professions is not only inimical to public welfare in fact, but is in contravention of an established and fixed community want.

We are therefore persuaded that that which tends to debase the learned professions is at war with the public interest and is therefore contrary to public policy.

Does practice of the learned professions by a profit corporation functioning through duly licensed practitioners tend to debase the professions?

We pause to emphasize the word "tend" because the learned trial court has found that the Bartron Clinic was innocent of any unethical intention or practice, and that its licensed officers and employees controlled its professional activities. Our present concern is with the tendency of the challenged conduct. Though the exhibited instance of that conduct has accomplished no evil, if its inherent tendency be at war with public interest, it is contrary to public policy. Moore v. Hyde, supra.

Because of the rights with which the law invests a stockholder in a corporation for profit, recognition of such

a means of conducting a professional business involves yielding the right of participation in control of its policies and in its earnings to lay persons. A share in the fees of professional men would come to the owners of capital stock as a matter of right in the form of dividends. The stockholder's right to vote his stock would provide him with an instrumentality to be used for shaping policy. Ownership of stock would ordinarily qualify him to serve as a director or officer of the company. Lay ownership of stock would be ultimately assured by the incidental rights of transfer and succession. The object of such a company would be to produce an earning on its fixed capital. Its trade commodity would be the professional services of its employees. Constant pressure would be exerted by the investor to promote such a volume of sales of that commodity as would produce an ever increasing return on his investment. To promote such sales it is to be presumed that the layman would apply the methods and practices in which he had been schooled in the market place. The end result seems inevitable to us, viz., undue emphasis on mere money making, and commercial exploitation of professional services. To universalize the use of this method of organizing the professions, or to permit such a use to become general, would ultimately wipe out or blight those characteristics which distinguish the business practices of the professions from those of the market place. Such an ethical, trustworthy and unselfish professionalism as the community needs and wants cannot survive in a purely commercial atmosphere.

In Moore v. Hyde, supra, this court had under consideration a contract by laymen to supply a client with a lawyer. In holding such a bargain illegal because contrary to public policy, this court said [39 S. D. 196, 163 N. W. 708]: "No more can plaintiff recover from defendant for services in bringing an attorney to him. The one case is as equally contrary to good morals and public policy as the other. The alleged contract is one to pay for the services of an intermeddler in litigation. It savors of the business of brokerage in the relation of attorney and client. It detracts from the

essential dignity of the profession. It is the capitalization of the influence of a layman over a lawyer. The sanctioning of such a contract would tend to commercialize the practice of law and to make legitimate the business of furnishing lawyers to clients."

That such is the tendency of the profit corporation when used to conduct a professional practice is not a matter of mere fancy or conjecture. It is a matter of common knowledge that this form of organization has been tried in the field of dentistry and resulted in such unethical and commercial practices as induced the Legislature of this and many other states to pass statutes expressly prohibiting its use.

■■ Being convinced that the practice of the learned professions by a profit corporation tends to the commercialization and debasement of those professions, we are of the opinion that such a mode of conducting the practice is in contravention of the public interest and is against public policy. It follows that we are of the view that insofar as the bargains of the Bartron Clinic and Codington County dealt with medical and surgical services, they were illegal.

■■ We turn to a consideration of the legality of these contracts to supply medicines to the county poor. The corporation was not licensed under the pharmacy licensing statutes. The medicines, however, were prescribed by corporate employees in the course of the practice of medicine. Those pharmacy statutes contain a proviso in words as follows: "Provided, that nothing in this chapter shall apply to or in any manner interfere with the business of any physician or licensed veterinary as a physician or licensed veterinary or prevent him from supplying to his patients such articles as may seem to him proper, * * *." Chapter 163, Session Laws of 1933; § 7743, Rev. Code of 1919.

The legislative intention is clearly revealed. It intended to exclude the practice of medicine from the regulations contained in the pharmacy statutes. However, while the quoted section effectively removes its subject matter from the scope of those regulations, it does not authorize the sale

of medicines by a physician in any other manner than as an incident of the practice of his profession. Medication is but an integral part of the service he performs in treating human ailments, and the right to furnish medicine rests on the right to treat disease. It follows that, it being against public policy for the corporation to engage in the practice of medicine, all of the incidents of that practice, including medication, are contrary to public policy.

It is asserted in cases 8409 and 8410 that the county board acted within the limits of its jurisdiction as a quasi-judicial body in allowing the claims of the Bartron Clinic for professional services and medicines, and no appeal having been taken from the action of that board, that the county is concluded by that action. This contention is predicated on the pronouncement of this court in Hoyt v. Hughes County, 32 S. D. 117, 142 N. W. 471, as reiterated in. Codington County v. Board of Commissioners of Codington County, 51 S. D. 131, 212 N. W. 626; State ex rel. Cook et al. v. Richards, 61 S. D. 28, 245 N. W. 901; and Adamson v. Minnehaha County, 67 S. D. 423, 293 N. W. 542. The contention is untenable. In Hoyt v. Hughes County, supra [32 S. D. 117, 142 N. W. 473], it was said, "The term 'quasi judicial' is used to describe acts, not of judicial tribunals usually, but acts of public boards and municipal officials, presumed to be the product or result of investigation, consideration, and human judgment, based upon evidentiary facts of some sort, in a matter within the discretionary power of such board or officer." The county challenges the legality of the underlying contracts. The issue thus presented is judicial as contradistinguished from quasi-judicial. Hoyt v. Hughes County, supra. The county board being without jurisdiction to determine whether the contracts contravened public policy, its action in allowing the claims does not constitute an adjudication of that issue. Campbell County v. Overby, 20 S. D. 640, 108 N. W. 247; South Dakota Employers Protective Ass'n v. Codington County, 68 S. D. 72, 298 N. W. 674.

We come now to a consideration of the right of the county to recover sums paid to the Bartron Clinic for serv-

ices and medicines. This issue arises under assignments of error in case No. 8410. Reasoning from the premise that the exhibited contracts with the Clinic were prohibited by Section 7717, supra, of the licensing statutes, and were against public policy, the circuit court concluded that the county was without power to contract with the Clinic for professional services and medicines, and that equitable considerations founded upon retention of the benefits received by the county thereunder offered no impediment to the right of the county to recover money paid under such executed illegal bargains.

▇▇ The statutes provide that "Every county shall relieve and support all poor and indigent persons lawfully settled therein," and that "the county commissioners shall * * * perform all the duties with reference to the poor within their respective counties that may be prescribed by law." Sections 10035 and 10037, Rev. Code of 1919. In our opinion these statutes charged the county with obligation to minister unto the medical and surgical needs of its poor, and vested the board of commissioners with a broad discretion in fixing the terms of the contracts under which professional services and medicines are supplied for that purpose. We have no occasion to decide whether Section 10055, Rev. Code of 1919, dealing with the appointment of a physician to attend inmates of a county asylum constitute a limitation of these powers, because it does not appear that Codington County was operating under the statutes which permit a county to establish and maintain an asylum for its poor. Thus it appears that the county had power to bargain for the subject matter of the agreements we are considering.

Its agreements having been fully executed, the county now seeks to recover the payments its officers made to the Bartron Clinic and to retain the benefit of the valuable professional services and medicines it has received. It predicates its right to a refund of such payments on the theory that the bargains under which such payments were made were against public policy. It does not claim that the services and medicines it received were worthless, or worth

less than the aggregate of its payments. It asserts the view that it may appropriate these benefits and recover its payments.

 The action is quasi-contractual in character. Tobin v. Town Council of Town of City of Sundance, 45 Wyo. 219, 17 P.2d 666, 84 A. L. R. 902; Vincennes Bridge Co. v. Board of County Commissioners, 8 Cir., 248 F. 93, 160 C. C. A. 233; 4 Am. Jur. 499. The essential nature of such an action may best be indicated by quoting the words of Lord Mansfield in Moses v. MacFerlan, 2 Burr. 1005: "The gist of this kind of action is, that the defendant, upon the circumstances of the case, is obliged by the ties of natural justice and equity to refund the money." If the Bartron Clinic is obligated to refund these payments, that obligation cannot be said to arise from ties of natural justice. That the claim of the county is inequitable is obvious. The trial court was of the view that the case is controlled by the pronouncements of this court in Campbell County v. Overby, supra, and Norbeck & Nicholson Co. v. State of South Dakota, 32 S. D. 189, 142 N. W. 847, Ann. Cas. 1916A, 229. We do not share that opinion. We entertain the view that departure from those principles of private law through which the courts seek to achieve natural justice may only be justified in adjudicating claims by or against a public corporation when it is clear that their application will strike down or nullify policies or measures adopted for the protection of such a corporation or its taxpayers. Such policies were involved in the cited cases. In Campbell County v. Overby, the defendant had entered the services of the county for a fixed compensation. He had been paid additional compensation for alleged special services contrary to an express provision that county officers "shall receive no compensation for their services other than that so provided by law." Chapter 65, Session Laws of 1891. In Norbeck & Nicholson Co. v. State, supra, recovery on the quantum meruit was denied a contractor for services performed under an express contract made in contravention of prohibitions contained in the Constitution for the reason that to have permitted recovery would have nullified such constitutional provisions.

■■ Such a policy, designed to protect the special interests of the county and its taxpayers, is not involved in the case at bar. The interests of the county are related to the policy we have under consideration in no different manner or degree than those of the public at large. The illegal bargains were not ultra vires in the strict signification of that term. See McQuillin on Muncipal Corporations, 2d Ed., Vol. 3, § 1274. We think no logical reason can be advanced for attaching any different consequences to a violation of such a policy in a case where a public corporation is a party than in a case arising between individuals. True, as pointed out in Norbeck & Nicholson Co. v. State, supra, the county is not in pari delicto and for that reason comes within an exception to the rule that the courts will leave the parties to an illegal bargain where it finds them. That exception, however, applies to individuals as well as to public corporations. It permits a party not in pari delicto to disaffirm an executed illegal bargain and claim restitution of payments made on the faith thereof. 17 C. J. S., Contracts, § 274, p. 660; 12 Am. Jur. 734. The exception but instances the insistence of the courts upon doing justice between the parties, if that end may be attained without recognizing the illegal bargain or undermining the particular public interest public policy seeks to safeguard. Manifestly, justice in such a case will not be done if plaintiff is permitted to recover his payments and retain valuable benefits received under the agreement. The judgment, if justice is to be done, must be shaped by the facts of the particular case, and solely because the plaintiff is a public corporation will not justify the court in ignoring equities. Tobin v. Town Council of Town of City of Sundance, and Vincennes Bridge Co. v. Board of County Commissioners, supra. In the case at bar the county had power to provide for the medical needs of its poor and indigent. Had it not received the benefit of the services of the duly licensed employees of the Bartron Clinic it would have been compelled to expend public funds for like services elsewhere. In procuring the needed services public policy was violated. The subject matter of the contract was not vicious in itself, and no moral turpitude was involved. The

defendant did not act in bad faith. The public interest is adequately and effectively protected by the judicial policy applied supra, under which the courts refuse to lend themselves to that which is against the public interest. Considerations based on natural justice may be permitted to mould the judgment in the case at bar without withdrawing any public safeguard or striking down any provision adopted to protect the county or its taxpayers. We therefore conclude that no circumstance warrants or supports the judgment of the learned trial court in this particular cause. Plaintiff has failed to show that defendant holds that which according to the ties of natural justice, or for reasons based on public policy, it is obligated to refund. The judgment in case No. 8410, in our opinion, should therefore be reversed.

Summarizing, we conclude that principles of public policy require that the judgments of the learned trial court in cases Nos. 8408 and 8409 be affirmed, and that equitable principles dictate that its judgment in case No. 8410 be reversed.

Other contentions made by the litigants which we have not discussed have been considered, but are deemed untenable as a matter of law or are deemed to be foreclosed by the findings of the trial court.

The judgments in cases Nos. 8408 and 8409 are affirmed, and the judgment in case No. 8410 is reversed.

All the Judges concur in No. 8408 and No. 8409; and in No. 8410 RUDOLPH, P.J., and POLLEY and ROBERTS, JJ., concur, and WARREN, J., dissents.

WARREN, J. (dissenting in No. 8410). The result reached in the majority opinion ought to be modified so as to include the affirmance of No. 8410.

I do not believe that the defendants acted in good faith. To me it seems that the evidence sustains the finding by the court which was as follows: "Doctor H. J. Bartron was made solely for and on behalf of the corporation, and with intent that the same was to be performed by the corporation", especially in view of the fact that the majority deci-

sion expressly holds "that the bargains between the Bartron Clinic and Codington County are against public policy." It would seem to me that the defendants cannot retain the benefit which they derived from the unlawful act and that it is consonant to the spirit and policy of the law that the plaintiff, Codington County, should be permitted to recover back the money paid to the defendants. This is the law today and in my opinion is supported by the great weight of authority. It applies to this case because the transaction here in question is against public policy and in violation of law. The unlawful contract and the acts of the officers in entering into the contract were repudiated and the action was brought to recover back the money taken without authority of law from the treasury. The reasoning in Campbell County v. Overby, 20 S. D. 640, 108 N. W. 247, 248, permitting the recovery of money retained by the County Treasurer, received by him as certain commissions for the sale of real estate at tax sales, in face of the law limiting the compensation of a county treasurer as to salary, is applicable to the facts in the instant case. In it the court held that the claim on its face showed that it was illegal and its allowance was wholly unauthorized and said "county commissioners are not the county nor its agents in the ordinary sense. They are public officers with definite and limited powers, to whom the rules relating to voluntary payments by persons in their individual capacities are not applicable."

The plaintiff county was a public corporation and therefore was not bound by the rule as to voluntary payments applicable to individuals and private corporations as that rule does not apply to public corporations which can always recover back money paid out on void or illegal claims or contracts. The defendants knew or should have known of the statutory provision, Rev. Code 1919, § 10055, relating to the annual appointing of a well qualified physician to attend to the county asylum. This statute does not empower the county commissioners to appoint a corporation to take the place and perform the office as county physician. Therefore any claims paid to the corporation can not be legally

chargeable against the county. The statutory term "well-qualified physician" has a distinct meaning and it would not be much amiss to say that the clear cut language used in this law was designed for the protection of public monies within its treasury. Sioux Falls Paint & Glass Co. v. Knudtson, County Auditor, 66 S. D. 261, 281 N. W. 201.

This court pointed out in Norbeck & Nicholson Co. v. State, 32 S. D. 189, 142 N. W. 847, Ann. Cas. 1916A, 229, that an unlawful and illegal act can never be the basis of recovery against a public corporation. I shall not encumber this opinion by quoting but wish to reiterate and reaffirm all of the portions in that opinion covering illegal contracts such as the one now under consideration. See also Norbeck & Nicholson Company v. State of South Dakota, 33 S. D. 21, 144 N. W. 658. This court cited and quoted with approval the Norbeck & Nicholson Company v. State, supra, in Jacobson v. Ruden et al., 60 S. D. 285, 289, 244 N. W. 363. It would seem that any claim based upon the appointment as "physician" may well for argumentative purposes be comparable to an officer holding a county office and therefore the legal rights existing under the well established principle of law "money paid to a county officer to which he is not entitled by law may be recovered back, without previous demand, in an action for money had and received instituted by the county, or by a taxpayer under some statutes." 20 C. J. S., Counties, § 128. 15 C. J. 509 § 176(b) must apply to the facts in this case. Campbell County v. Overby, supra. Natural justice will not be done by our refusing to grant the respondents the power of this court to recover back the money paid over to the defendants. The reason uniformly adopted by courts permitting a recovery where the consideration for which payment was made is illegal, void and contrary to public policy is well stated in footnote 35, 15 C. J. pp. 662, 663: "The reason for the rule (1) is that the payment of a claim not legally chargeable to the county is not a voluntary payment by the county but an unauthorized act of its agents and is without consideration. Mobile County v. Williams, 180 Ala. 639, 61

So. 963; People v. McCord, 143 Ill. App. 28; Sudbury v. Board of Com'rs of Monroe County, 157 Ind. 446, 62 N. E. 45; Board of Sup'rs of Richmond County v. Ellis, 59 N. Y. 620. (2) Such a payment does not come within the rule precluding the recovery of payments made under mistake of law. Board of Com'rs of Huntington County v. Heaston, 144 Ind. 583, 41 N. E. 457, 43 N. E. 651, 55 Am. St. Rep. 192." See also 20 C. J. S., Counties, § 317.

"It is contended that the only penalty provided in said statute is that an action cannot be maintained or recovery had against the district on such a contract. That being true, the money once paid on such void contract cannot be recovered back. We cannot agree with that contention. That statute was not intended to prevent the district or a taxpayer thereof for the district from recovering back any money paid by the district upon a void contract. The general rule is that money paid by a municipal corporation upon a void contract may be recovered back by such corporation; or, in case the proper authorities refuse to proceed to do so, a taxpayer thereof may do so for the corporation, and this general rule is not changed or abrogated by said statute in such cases as the one at bar." Independent School Dist. No. 5 v. Collins, 15 Idaho 535, 98 P. 857, 859, 128 Am. St. Rep. 76.

Payments made by a municipality to a contractor may be recovered back in a proper case. The municipality can however recover only to the extent that the payments were erroneous. 44 C. J. 408 § 2611(2) and see Inland Construction Co. v. Rector et al., 133 Ark. 277, 202 S. W. 712, and City of Leavenworth v. Scaman, 138 Wash. 6, 245 P. 7.

"A municipal corporation may invoke the aid of the courts to protect its property and funds to the same extent as an individual * * * and it is held by the weight of authority that when a municipal corporation has paid out its funds for purposes for which it had no legal or constitutional right to spend money, it may maintain an action to recover them back." 19 R. C. L. 1142 § 418, and see cases cited in footnote 19.

In Ritchie v. City of Topeka, 91 Kan., 615, 138 P. 618,

621, it was contended that the city had paid the money on the sewer contract voluntarily and was therefore precluded from recovering it back. The court held that voluntary payments had no application and we quote: "Being unauthorized, the officers' act was void, and the payment made by them cannot be treated as one made by or binding upon the city. Payments of municipal funds by public officers are not regarded as those made by individuals out of their own funds, and overpayments or other payments by public officers upon illegal demands against a muncipality may be recovered back. Board of Commissioners of Jefferson County v. Patrick, 12 Kan. 605; Village of Ft. Edward v. Fish, 156 N. Y. 363, 50 N. E. 973; Allegheny County v. Grier, Appellant, 179 Pa. 639, 36 A. 353; County of Wayne v. Reynolds, 126 Mich. 231, 85 N. W. 574, 86 Am. St. Rep. 541; State v. Young, 134 Iowa 505, 110 N. W. 292, 13 Ann. Cas. 345; Board of Commissioners of Huntington County v. Heaston, 144 Ind. 583, 41 N. E. 457, 43 N. E. 651, 55 Am. St. Rep. 192; Frederick v. Douglas County et al., 96 Wis. 411, 71 N. W. 798."

I do not believe that this court should permit the defendants to retain the money paid over to them under the facts presented to the court. To do so might, I am afraid, encourage others to travel the same route. I am not satisfied that the majority opinion will accomplish the result to curb illegal transactions such as are now before us.

The findings, conclusions and judgment of the trial court are sustained.