630 So.2d 1147 (1993)
PRACTICE MANAGEMENT ASSOCIATES, INC., Appellant,
v.
William C. BLICKENSDERFER, Appellee.
No. 92-01529.
District Court of Appeal of Florida, Second District.
November 17, 1993.
*1148 Julee L. Milham, St. Petersburg Beach, and Melissa Gilkey Mince of Fernandez & Saunders, P.A., Pinellas Park, for appellant.
Gene A. Turk, Jr., Carbondale, IL, for appellee.
PER CURIAM.
The facts of this case and the issue presented on appeal are identical to those in our recent decision Practice Management Associates, Inc. v. Orman, 614 So.2d 1135 (Fla. 2d DCA 1993). The case concerns a "Practice Starter Agreement" between a chiropractor and Practice Management Association, Inc., a Florida corporation (hereafter "PMA"). The specifics of the contract are described in Orman, 614 So.2d at 1136. PMA sued after appellee defaulted on the weekly payments required under the agreement. The circuit court granted summary judgment for appellee, finding that the agreement impermissibly called for "fee splitting."[1]
The agreement contains a forum selection clause under which the laws of Florida govern its interpretation and construction. In Orman we found this clause to be valid. "The only exception is if the performance of the contracts will cause the chiropractors to violate the laws or regulations governing their profession in the state where they practice." 614 So.2d at 1137. Appellee William Blickensderfer is licensed and practices in the state of South Dakota. The circuit court looked to South Dakota law and proceeded to find the agreement "is illegal under South Dakota law because it constitutes division of professional fees in violation of [S.D. Codified Laws Ann. §] 36-5-16 and regulations promulgated pursuant thereto; specifically, [S.D. Admin. R.] 20:41:09:10." We cannot agree with this conclusion.
The South Dakota statute governing refusal and revocation of chiropractors' licenses contains no specific mention of fee splitting. Our research reveals no cases involving chiropractor discipline on this basis, nor are any cited to us by either party. Instead, the parties urge opposing interpretations of the following passage from the code of ethics adopted by South Dakota's Board of Chiropractic.[2]
No division of fees for services is allowed, except with another chiropractor or a person licensed under chapter 36 [South Dakota statutes], and then based only upon the division of services or responsibility.
Dr. Blickensderfer contends that "the plain language of the Code" forbids "dividing his fees for services" with anyone for any reason. By contrast, PMA urges that "[t]he only reasonable interpretation of the Code is one which limits the scope of its prohibition to payments for patient referrals by other doctors," something the PMA contract does not involve. As with the statute, apparently no South Dakota cases exist which interpret the provision.
It is our conclusion that the reference to "division of services" clearly indicates an intent to disavow "division of fees" for mere patient referrals  that is, the conventional understanding of what constitutes "fee splitting." The contrary interpretation, if carried to its logical conclusion, would lead to absurd results. Presumably all of Dr. Blickensderfer's gross income consists of "fees for services." If he were not permitted to "divide" those fees to pay such necessary expenses as secretarial salaries, office rent, and telephone charges, his practice would not long survive.
Finally, Dr. Blickensderfer argues that the terms of the PMA contract are *1149 repugnant to South Dakota public policy. In support of this contention he places great reliance upon Bartron v. Codington County, 68 S.D. 309, 2 N.W.2d 337 (1942), invalidating a contract between a county and a corporation to provide medical services for the poor, in which the court discussed "[d]ebasement of the learned professions." 2 N.W.2d at 345. In particular, our attention is drawn to one long passage.
Because of the rights with which the law invests a stockholder in a corporation for profit, recognition of such a means of conducting a professional business involves yielding the right of participation in control of its policies and its earnings to lay persons. A share in the fees of professional men would come to the owners of capital stock as a matter of right in the form of dividends. The stockholder's right to vote his stock would provide him with an instrumentality to be used for shaping policy. Ownership of stock would ordinarily qualify him to serve as a director or officer of the company. Lay ownership of stock would be ultimately assured by the incidental rights of transfer and succession. The object of such a company would be to produce an earning on its fixed capital. Its trade commodity would be the professional services of its employees. Constant pressure would be exerted by the investor to promote such a volume of sales of that commodity as would produce an ever increasing return on his investment. To promote such sales it is to be presumed that the layman would apply the methods and practices in which he had been schooled in the market place. The end result seems inevitable to us, viz., undue emphasis on mere money making, and commercial exploitation of professional services. To universalize the use of this method of organizing the professions, or to permit such a use to become general, would ultimately wipe out or blight those characteristics which distinguish the business practices of the professions from those of the market place. Such an ethical, trustworthy and unselfish professionalism as the community needs and wants cannot survive in a purely commercial atmosphere.
2 N.W.2d at 346.
Dr. Blickensderfer does not operate, so far as we can tell, as a corporation, and PMA is not a stockholder entitled to promote policies that encourage the undue commercialization of his practice. While it is obviously to PMA's advantage that Dr. Blickensderfer's practice thrive, it has little recourse in the event the practice tends more toward "unselfish professionalism." Moreover, it is questionable whether modern South Dakota policy honestly expects that a chiropractor will not pursue a remunerative practice, which is the purported objective of the services offered by PMA. See, e.g., Green v. Clinic Masters, Inc., 272 N.W.2d 813 (S.D. 1978).[3]
The evils foreseen in Bartron are not unlike those associated with traditional notions of fee splitting: the encouragement of superfluous medical treatment and other professional services solely for the profit of the practitioner. It does not necessarily follow that such pernicious practices will be encouraged by association with PMA, whose contract promises, inter alia, advice on "staff training, advertising, insurance procedures, equipment selection, billing practices, [and] financial advice." In short, we are not persuaded *1150 that holding Dr. Blickensderfer to his end of the PMA contract requires him to violate either the express law or the inchoate public policy of South Dakota.
Reversed and remanded for further proceedings consistent with this opinion.
CAMPBELL, A.C.J., and PARKER and PATTERSON, JJ., concur.
NOTES
[1] "The Practice Starter Agreement provides a method of compensation that does not fall within conventional definitions of fee splitting. Traditionally, fee splitting is patient specific in the health care field and case or client specific in the legal field. The Practice Starter Agreement requires the chiropractor to give PMA a percentage of weekly gross income or a minimum weekly set fee, whichever is greater." Orman, 614 So.2d at 1137 (footnote omitted).
[2] This language, it should be noted, is markedly similar to the relevant provision of the Illinois Medical Practices Act we were called upon to construe in Orman, 614 So.2d at 1138.
[3] Green was a South Dakota chiropractor who purchased a "system" which the court described as "designed to increase the profitability of [his] chiropractor practice." 272 N.W.2d at 814. Like the PMA contract, the agreement included a forum selection clause, in this instance requiring litigation to be commenced in Colorado. In determining that Green should be held to the terms of his contract, the court noted that he was "an experienced professional capable of understanding and intending the agreements he makes." 272 N.W.2d at 816. Ethical considerations were not at issue in the case.