#26523-a-JKK

**2013 S.D. 66**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

LAW CAPITAL, INC
a/k/a LAW CAPITAL,                                    Plaintiff and Appellant,

v.

DIANE KETTERING, PERSONAL
REPRESENTATIVE OF THE
DOUGLAS R. KETTERING ESTATE,          Defendant and Appellee.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FIRST JUDICIAL CIRCUIT
HUTCHINSON COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE GLEN W. ENG
Judge

* * * *

DAVID M. HOSMER
Yankton, South Dakota                          Attorney for plaintiff
                                                               and appellant.


WILLIAM FULLER of
Fuller & Williamson, LLP
Sioux Falls, South Dakota                     Attorneys for defendant
                                                               and appellee.

* * * *

CONSIDERED ON BRIEFS
ON APRIL 22, 2013

OPINION FILED **08/21/13**

#26523

KONENKAMP, Justice

[¶1.] This is a legal malpractice case against a deceased attorney's estate. The circuit court granted summary judgment for the estate.

## Background

[¶2.] In December 2005, Thomas Konrad urgently needed $225,000. No bank would lend him the money. He discussed his problem with Attorney Douglas Kettering, who had performed legal services for him in the past. Kettering told Thomas that he knew a person who could lend him the money: Bob Law of Law Capital, Inc. (Law). In addition to their attorney-client relationship, Law and Kettering had been partners in at least one of Law's business ventures. During Kettering's conversation with Law about a loan for Thomas, Law asked whether there would be collateral for the loan. Kettering told Law that there was a "half section of ground clear," referring to Thomas's parents' land. In agreeing to the loan, Law dictated its terms: Thomas would repay $225,000 plus $20,000 in interest by January 15, 2006, and then $500 per day until Thomas paid the debt in full.

[¶3.] Around the same time, Thomas was having marital problems. He feared that his wife, in their impending divorce, might gain an interest in his parents' land when they died. Thomas's parents, Norman and Leola Konrad, were farmers who owned an unencumbered 320 acres. Thomas shared his concern with his parents and suggested that they have Kettering draft the necessary paperwork to protect their land. The Konrads later testified that they remembered meeting with Kettering at his office in August 2005, and signing documents they thought would protect their land from Thomas's wife.

-1-

[¶4.] On December 15, 2005, Thomas and his parents went to Kettering's office and executed the promissory note and mortgage Kettering drafted, whereby the Konrads provided the collateral for Thomas's $225,000 loan from Law. Thomas later claimed that he, alone, went into Kettering's office, signed the note and mortgage, received a check for $225,000, and returned to his vehicle. His parents then went inside and signed paperwork. Thomas could not verify what his parents signed, and the Konrads could not remember what they signed. But their signatures appear on the note and mortgage, and they do not dispute that the signatures are theirs. Neither the Konrads nor Thomas left Kettering's office with copies of the note or mortgage. Kettering recorded the mortgage with the Hutchinson County Register of Deeds.

[¶5.] On March 9, 2006, Thomas paid Law $25,000 on the note. He never made another payment. Law claimed that for several years he asked Kettering to collect the unpaid portion of the note from Thomas and that Kettering assured Law that he would. But Kettering took no action against Thomas. In late 2008, Law went to the Konrads' home and told Norman that the note he and his wife had signed with Thomas was in default. According to Law, Norman acted as though he knew nothing of any note or mortgage.

[¶6.] On April 23, 2009, at age fifty-five, Kettering passed away. Seven months later, Law retained counsel and brought suit to enforce the note and mortgage against Thomas and the Konrads. In his answer, Thomas asserted an affirmative defense: the note and mortgage were void because Kettering failed to disclose his attorney-client and business relationship with Law and failed to obtain

a waiver of this conflict of interest.  Law amended his complaint to add the Douglas A. Kettering Estate as a defendant.  In the Konrads' answer to Law's amended complaint, they asserted that Kettering fraudulently induced them into signing the note and mortgage.

[¶7.]     Law reached a settlement with Thomas and the Konrads.  In exchange for $220,000 and an agreement to assist Law in his litigation against the Kettering Estate, Law released the mortgage on the Konrads' land.  Law then sought to recover from the Estate the amounts outstanding on the note, asserting that Kettering's acts voided the note and mortgage, and, therefore, the Estate was liable to Law for the interest due on the note: $925,456.14.

[¶8.]     In moving for summary judgment, the Estate argued that Law could have legally enforced the note and mortgage regardless of Kettering's conflict of interest.  The circuit court denied the motion.  In its second motion for summary judgment, the Estate argued that regardless of Kettering's failure to obtain a waiver of any conflict of interest, Kettering had not fraudulently induced the Konrads into signing the note and mortgage; consequently, Law could have enforced the note and mortgage against the Konrads.  The court granted summary judgment for the Estate.  Law appeals asserting that the court erred as a matter of law when it failed to void the note and mortgage on the "substantial and material evidence of Kettering's conflict of interest and his fraudulent inducement[.]"

### Analysis and Decision

[¶9.]     Law contends that had Thomas and the Konrads defended the suit, they would have been able to void the note and mortgage, which would have

extinguished their legal obligations to Law. Now standing in their shoes, Law maintains that Kettering committed legal malpractice when he failed to disclose to Thomas his conflicting attorney-client relationship, thus violating the public policy of this State and consequently voiding the note and mortgage. Law further contends that Kettering fraudulently induced the Konrads into signing these documents, also making them void. With the note and mortgage void, Law argues the Estate is liable to him for the interest he would have recovered had Kettering not acted negligently or fraudulently.

[¶10.]      As in all summary judgment appeals, we review de novo whether there were any genuine issues of material fact and whether the moving party was entitled to judgment as a matter of law. SDCL 15-6-56(c); *Horne v. Crozier,* 1997 S.D. 65, ¶ 5, 565 N.W.2d 50, 52. A contract is unlawful if it violates "an express provision of law or . . . the policy of express law[.]" *See* SDCL 53-9-1. "Public policy is found in the letter or purpose of a constitutional or statutory provision or scheme, or in a judicial decision." *Niesent v. Homestake Mining Co.*, 505 N.W.2d 781, 783 (S.D. 1993) (citations omitted). Whether a contract violates public policy is a question of law, reviewable de novo. *Jasper v. Smith,* 540 N.W.2d 399, 403 (S.D. 1995).

[¶11.]      Law argues that the public policy of this State forbids the enforcement of a contract created by an attorney who committed legal malpractice by being in a dual and adverse relationship with two clients, without their consent. As this Court wrote more than seventy years ago, "[T]hat which tends to debase the learned professions is at war with the public interest and is therefore contrary to public policy." *See Bartron v. Codington Cnty.*, 68 S.D. 309, 327, 2 N.W.2d 337, 345 (1942).

A claim for legal malpractice is established when a party proves: (1) an attorney-client relationship giving rise to a duty; (2) the attorney, either by an act or failure to act, violated or breached that duty; (3) the attorney's breach proximately caused injury to the client; and (4) actual injury, loss, or damage. *Himrich v. Carpenter*, 1997 S.D. 116, ¶ 11, 569 N.W.2d 568, 571 (citation omitted).

[¶12.]     No one disputes that Kettering had an attorney-client relationship with both Thomas and Law. Kettering's dual relationship conflicted, at the very least, because both clients would have presumably wanted the most advantageous lending agreement. This conflict, then, imposed a duty on Kettering to inform Thomas that he had an attorney-client relationship with Law, that it might conflict with his attorney-client relationship with Thomas, and that he needed to obtain Thomas's informed, written consent. *See* SDCL ch. 16-18, app. Rule 1.7 (a), (b) (South Dakota Rules of Professional Conduct). Accepting Thomas's assertion that Kettering never told him of Kettering's relationship with Law, Kettering breached his duty to Thomas.

[¶13.]     Yet, as this Court has cautioned ever since territorial days, "'The power of courts to declare a contract void for being in contravention of sound public policy, is a very delicate and undefined power; and, like the power to declare a statute unconstitutional, should be exercised only in cases free from doubt.'" *Sch. Dist. No. 61 v. Collins*, 6 Dakota 145, 41 N.W. 466, 468 (1889) (citation omitted); *Anderson v. Craven*, 57 S.D. 168, 231 N.W. 538, 539 (S.D. 1930). Would Thomas have not used Kettering's services or declined to execute the note and mortgage had he known of Kettering's relationship with Law? On this question, there is

considerable doubt. Thomas testified that due to the urgency of the situation, the specific reason for the urgency he could not recall, he did not read the note or mortgage. He said, "I was not aware of the terms of the promissory note and I wasn't aware of anything — I just signed the papers and picked up the check." In his deposition, he could not "say positively" whether he would have signed the note had he actually known its terms. And he could not recall whether, at the time, he understood when it was to be repaid. Needing the money and saying that he trusted Kettering that the loan was okay, Thomas had simply signed the documents. South Dakota adheres to the rule "that a party to a lawsuit cannot claim the benefit of a version of relevant facts more favorable to his own contentions than he has given in his own testimony." *Connelly v. Sherwood,* 268 N.W.2d 140, 141 (S.D. 1978) (citation omitted). Standing in Thomas's shoes, Law is bound by Thomas's testimony.

[¶14.]     Acknowledging Kettering's conflict of interest, the taking of a $225,000 loan while heedless of its terms invokes no manifest public policy to justify invalidating the loan on the ground one's lawyer had a conflict of interest. Moreover, our courts look askance at those signing a contract without reading it and knowing its conditions and then using such ignorance as a basis to evade the contract's obligations. *LPN Trust v. Farrar Outdoor Adver., Inc.,* 1996 S.D. 97, ¶ 13, 552 N.W.2d 796, 799 (citation omitted). This is essentially Thomas's claim: his attorney told him the note and mortgage were okay; therefore, he neither read the documents nor understood how he was to repay the loan. Contractual obligations should not dissolve on such flimsy substance. Indeed, Law points us to no authority

that, on these facts, compels voiding the note and mortgage. "Until firmly and solemnly convinced that an existent public policy is clearly revealed," this Court's duty is "to maintain and enforce contracts [rather] than to enable parties thereto to escape from their obligation on the pretext of public policy[.]" *Bartron,* 68 S.D. at 323, 2 N.W.2d at 344 (quoting *Baltimore & Ohio Sw. Ry. Co. v. Voigt,* 176 U.S. 498, 505, 20 S. Ct. 385, 387, 44 L. Ed. 560 (1900)). Contrary to Law's insistence, therefore, the contract between Law and Thomas did not contravene public policy solely because it was drafted by an attorney who failed to disclose a conflicting attorney-client relationship. Thus, we see no error in granting summary judgment against Law on his claim that Thomas would have been able to void the note and mortgage on public policy grounds.

[¶15.] We next address Law's claim that Kettering fraudulently induced the Konrads into signing the note and mortgage. Fraudulent inducement entails willfully deceiving persons to act to their disadvantage. *Johnson v. Miller*, 2012 S.D. 61, ¶ 13, 818 N.W.2d 804, 808. Deceit is defined in SDCL 20-10-2 as:

> (1) The suggestion, as a fact, of that which is not true, by one who does not believe it to be true;
>
> (2) The assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true;
>
> (3) The suppression of a fact by one who is bound to disclose it, or who gives information of other facts which are likely to mislead for want of communication of that fact; or
>
> (4) A promise made without any intention of performing.

Although questions of fraud and deceit are normally questions of fact for a jury, such claims "may never be presumed and left to mere speculation or conjecture." *Estate of Elliot v. A & B Welding Supply Co., Inc.*, 1999 S.D. 57, ¶ 19, 594 N.W.2d

707, 710 (citation omitted). "[W]hen there is no evidence to support the submission of a question to the jury, it is improper to do so." *Rist v. Karlen*, 90 S.D. 426, 431, 241 N.W.2d 717, 720 (S.D. 1976) (citation omitted).

[¶16.]     Norman and Leola Konrad testified in their depositions and by affidavit that they "were told the documents [they signed] would, in fact, keep [their] ex-daughter-in-law [ ] from inheriting [their] property." They insisted they would have never signed the note and mortgage had they known their land was collateral for Thomas's $225,000 loan. They did not recall signing the note and mortgage on December 15, 2005, in Kettering's office, and therefore attested that they "were the victims of fraud or trickery[.]" Norman and Leola rely on their history of never borrowing money from others and only lending "very small amounts to [their] sons for very short periods of time."

[¶17.]     Still, the theory that Kettering fraudulently induced the Konrads into signing the note and mortgage rests on mere speculation. The Konrads do not remember signing the note and mortgage and do not remember being in Kettering's office on December 15. This is not a case like *Hauck v. Crawford*, where a landowner was tricked by sleight of hand into signing a mineral deed, because here there is no evidence that Kettering prevented the Konrads from reading the documents or manipulated them to prevent the Konrads from realizing what they signified. *See* 75 S.D. 202, 204-05, 62 N.W.2d 92, 93 (1953). Undeniably, the note the Konrads signed was entitled "Promissory Note," in bold print, and was only two pages long. The mortgage they signed was entitled "Collateral Real Estate Mortgage," also in bold print, and listed Law as the "Lender."

[¶18.]		In the end, Law's claim hinges on the supposition that the Konrads' frugal lifestyle — neither lending much money to their children nor borrowing money themselves — means that Kettering must have defrauded them.  We never presume fraud or lightly infer it.  *See Commercial Credit Equip. Corp. v. Johnson*, 87 S.D. 411, 416, 209 N.W.2d 548, 551 (1973), *disavowed for other reasons by Aschoff v. Mobil Oil Corp.*, 261 N.W.2d 120, 125 (S.D. 1977).  The circuit court did not err in granting summary judgment against Law on the claim of fraudulent inducement.

[¶19.]		Affirmed.

[¶20.]		GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.