#28856-aff in pt & rev in pt-JMK
**2021 S.D. 9**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

J. CLANCY, INC.,                                            Plaintiff and Appellant,

    v.

KHAN COMFORT, LLC, previously
known as KHAN DEVELOPMENT,
LLC; GHAZANFAR KHAN, individually;          Defendants and Appellees,

    and

FIRST INTERSTATE BANK, a
Montana Banking Corporation;
BLACK HILLS COMMUNITY
ECONOMIC DEVELOPMENT, INC.,
a South Dakota Non-Profit Corporation;
UNITED STATES SMALL BUSINESS
ADMINISTRATION; BKM ENTERPRISES,
INC. d/b/a WATCO POOLS, a Montana
Corporation; RAPID FIRE PROTECTION,
INC., a South Dakota Corporation; and
LAWRENCE COUNTY, a political
subdivision of the State of South Dakota,          Defendants.

* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE FOURTH JUDICIAL CIRCUIT
LAWRENCE COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MICHELLE K. COMER
Judge

* * * *

CONSIDERED ON BRIEFS
SEPTEMBER 30, 2019
OPINION FILED **02/10/21**

TIMOTHY J. BARNAUD
Belle Fourche, South Dakota

Attorney for plaintiff
and appellant.


SCOTT SUMNER
Rapid City, South Dakota

Attorney for defendants
and appellees.

#28856

KERN, Justice

[¶1.] J. Clancy, Inc. (J. Clancy), a construction company owned by Jere Clancy, sued Ghazanfar Khan (Khan) and his company, Khan Comfort, LLC (Khan Comfort), seeking enforcement of mechanic's liens it placed against the property. In the alternative, J. Clancy filed claims for breach of contract and unjust enrichment. Khan Comfort filed several counterclaims, including claims for overpayment and breach of contract.

[¶2.] After a bench trial, the circuit court concluded that J. Clancy's mechanic's liens were invalid and unenforceable because, in part, they were insufficiently itemized. It also held that a divisible, implied-in-fact contract, rather than an express contract, governed the relationship between the parties. The court rejected J. Clancy's breach of contract and unjust enrichment claims against Khan Comfort and instead found that J. Clancy breached the contract due to non-performance. It allowed J. Clancy to recover for the portions of the contract it had actually performed, but it ultimately determined that the value of J. Clancy's work was less than the payments Khan Comfort had already made. Accordingly, the court ordered J. Clancy to reimburse Khan Comfort for the overpayment. We reverse the circuit court's decision in part and remand for new determinations regarding breach and damages under the terms of the parties' contract.

**Facts and Procedural History**

[¶3.] In 2012, Khan decided to convert his Comfort Inn hotel in Spearfish, South Dakota to a Hampton Inn (Spearfish project). After developing a product improvement plan (PIP) with Hilton Worldwide, the owner of the Hampton Inn brand, Khan began looking for a contractor to complete the work. Khan had

-1-

previously hired J. Clancy to renovate the lobby area of Khan's Hampton Inn in Gillette, Wyoming (Gillette project) and was satisfied with his work. Khan approached J. Clancy to work on the Spearfish project, and the parties began contract negotiations.

[¶4.] In March 2012, Khan, acting on behalf of Khan Comfort, signed a document (March document) that listed the specific work J. Clancy needed to complete when renovating the hotel. The document included tasks such as crafting vanity bases for the guest bathrooms, procuring equipment items for a fitness room, and providing materials for reconstructing the breakfast, pool, and meeting rooms at the hotel. The amount charged for the work listed in the March document amounted to $191,258.11, but the document did not include the cost of labor or installation. A J. Clancy representative did not sign the document, and Khan Comfort did not pay the required 50% deposit to confirm the agreement. Likewise, J. Clancy did not, at this time, begin working on the listed projects.

[¶5.] In May 2012, Khan Comfort paid J. Clancy $20,000 as a deposit for work on the vanity bases and the fitness equipment. Upon receiving the deposit, J. Clancy began working on these specific items while the parties further negotiated the terms of an agreement. The next document, dated September 5, 2012 (September document), was J. Clancy's "standard proposal." It listed both the materials and labor that J. Clancy was willing to provide for Khan Comfort. The September document listed many of the same projects contemplated by the March document. However, it also enumerated several new projects and had a significantly higher total contract price of $308,922.28. With reference to labor

costs, the September document provided that the "[p]ricing includes installation noted in Quote." J. Clancy also charged a marked-up price on the materials included in the September document to compensate for labor costs associated with procuring and installing the materials.

[¶6.] Khan, on behalf of Khan Comfort, signed the September document the same day that J. Clancy sent it to him on September 5, 2012, but a representative from J. Clancy did not sign it. The next day, Khan Comfort paid J. Clancy $154,000 (approximately 50% of $308,922.28) in partial payment for the renovations, as required by the September document. J. Clancy started renovations the next day on September 6. J. Clancy submitted several invoices to Khan Comfort as the project progressed and in conformance with the provisions of the September document. Jere Clancy testified that both the contract and the invoicing practices used in the Spearfish project were similar to the parties' methods used in the prior Gillette renovation project.

[¶7.] As work progressed throughout the fall, the parties agreed to several change orders. Certain alterations were in writing while others were made orally. At some point, issues arose regarding whether J. Clancy was paying its subcontractors. To move construction along, Khan Comfort paid MLK Plumbing, which normally would have been J. Clancy's duty, for work MLK Plumbing performed in the bathrooms. Khan Comfort also gave Horst Acoustical a credit of

$3,024 for free hotel rooms at other properties that Khan owned as partial satisfaction for the cost of remodeling the lobby and breakfast area.[1]

[¶8.]       Aside from the initial payment in September, Khan Comfort made no progress payments to J. Clancy until December 12, 2012, when J. Clancy requested that Khan Comfort make two payments toward the project to ensure the construction schedule proceeded as expected.  Khan Comfort wired the payments to J. Clancy (each for $35,000), and J. Clancy acknowledged receipt of the payments at trial.

[¶9.]       J. Clancy left the construction site in February 2013.  According to the testimony at trial, J. Clancy's property manager, Charles Moore, had walked through the premises with Khan to determine if additional work was necessary.  Moore testified that Khan did not voice any dissatisfaction with the renovations during the walk-through even though the terms of the September document required that he do so within seven days of reviewing the work.  Khan did not refute this contention at trial.  Instead, he testified that he believed his dissatisfaction with the work was obvious because portions of the project were incomplete.

[¶10.]       After the walk-through, Khan Comfort refused to make any further payments, which prompted J. Clancy to file two mechanic's liens against the property.  The first lien (filed on April 29, 2013) demanded payment of $97,713.28

---

1.    There are no invoices or check images in the record reflecting that Khan Comfort paid any of the subcontractors for work on the hotel, but Khan Comfort did submit into evidence copies of its financial ledgers reflecting the payments.  The ledgers contained check numbers, dates, amounts, and payees.  The ledgers were not from Khan Comfort's accounts, but rather, were from ledgers connected to various other properties owned by Khan.

for various materials and products J. Clancy provided during renovations. The second lien (filed on May 10, 2013) listed a total of $7,422.05 for labor and materials supplied to complete the guestroom bath vanity bases.[2] Along with other documents, J. Clancy attached a one-page sheet to the second lien detailing information regarding the cost of labor.

[¶11.] On May 17, 2013, J. Clancy filed a ten-count complaint in circuit court against Khan Comfort and Khan, in his personal capacity, to foreclose his mechanic's liens or, in the alternative, to recover for breach of contract and unjust enrichment for the materials and labor described in the liens. In response, Khan Comfort asserted several counterclaims, including claims for overpayment and breach of contract.[3]

[¶12.] In August 2018, the circuit court held a three-day bench trial to resolve the dispute. The court considered testimony from Jere Clancy, Charles Moore (J. Clancy's property manager), and Ghazanfar Khan. At the close of the evidence, the court took the matter under advisement and later issued 91 pages of findings of fact and conclusions of law addressing the enforceability of the mechanic's liens, the

---

2. J. Clancy's initial lien amount included applicable taxes and was later amended to credit Khan Comfort for the $10,000 deposit on the vanity bases it paid J. Clancy in May of 2012. This credit represents half of the $20,000 total deposit made by Khan Comfort for both the vanity bases and fitness equipment.

3. Khan Comfort's six-count counterclaim alleged count 1: overpayment; count 2: breach of contract for failure to complete work and provide materials; count 3: breach of contract for work negligently performed, defective, and unworkmanlike work product; count 4: breach of contract for failure to pay subcontractors and suppliers; count 5: intentional destruction of property; and count 6: unjust enrichment. It also sought consequential damages and attorney fees.

status of the contract, and the merits of J. Clancy's breach of contract and unjust enrichment claims. It also resolved the six counts contained in Khan Comfort's counterclaim.

[¶13.]     The circuit court held that the documents attached to J. Clancy's mechanic's liens were insufficient to adequately itemize J. Clancy's labor fees for the project. For example, the court found the liens defective and invalid because they did not include the dates on which the labor was performed, the number of hours worked, the hourly wages paid, and the types of improvements made. Therefore, the court denied J. Clancy's claims seeking foreclosure on its mechanic's liens in their entirety.

[¶14.]     With reference to J. Clancy's breach of contract claims, the circuit court held that neither the March nor the September document met the criteria for an express contract. Instead, the court concluded that the parties had an implied-in-fact contract. With respect to performance of the contract, the court found that J. Clancy's work did not constitute either full or substantial performance. Finding J. Clancy's partial performance "divisible into units or modules of performance[,]" the court concluded J. Clancy could recover only the reasonable value of the goods and services it supported with evidence at trial.

[¶15.]     After a painstaking review of each contract invoice, the court concluded that the money Khan Comfort paid for J. Clancy's services exceeded the value of the work completed. Accordingly, the court rejected J. Clancy's claims altogether and found for Khan Comfort on its overpayment counterclaim (count 1). On December 6, 2018, the court ordered J. Clancy to reimburse Khan Comfort $33,442.92 for the

overpayment plus $19,432.81 in prejudgment interest. Although the circuit court also found for Khan Comfort on its breach of contract claims (counts 2-4), it did not award further damages. The court dismissed Khan Comfort's remaining claims and denied Khan Comfort's request for consequential damages. It also dismissed both parties' requests for attorney fees.

[¶16.] J. Clancy appeals, raising the following issues for our review, which we reorder and consolidate as follows:

I. Whether the circuit court erred in resolving the parties' breach of contract claims.

II. Whether the circuit court erred in holding that the mechanic's liens were not sufficiently itemized pursuant to SDCL 44-9-16.

III. Whether J. Clancy may bring a claim for conversion or unjust enrichment.

**Analysis and Decision**

### I. *Whether the circuit court erred in resolving the parties' breach of contract claims.*

[¶17.] J. Clancy challenges Khan Comfort's argument and the circuit court's conclusion that an implied-in-fact contract controlled the parties' business transactions. In J. Clancy's view, the evidence establishes that both parties assented to all material terms in the September document, creating an express contract. J. Clancy also argues that the circuit court erred when it concluded that J. Clancy did not substantially perform its contract obligations.[4]

*Status of the Contract*

---

4. Both parties agree that the September document did not control the work J. Clancy completed on the vanity bases and the fitness equipment.

-7-

[¶18.] The existence and interpretation of a contract are questions of law which we review de novo. *Koopman v. City of Edgemont by Dribble*, 2020 S.D. 37, ¶ 14, 945 N.W.2d 923, 926-27. *See also Harvey v. Reg'l Health Network, Inc.*, 2018 S.D. 3, ¶ 55, 906 N.W.2d 382, 398. "If in dispute, however, the existence and terms of a contract are questions for the fact finder." *Koopman*, 2020 S.D. 37, ¶ 14, 945 N.W.2d at 927. "To form a contract, there must be . . . mutual assent on all essential terms." *Jacobson v. Gulbransen*, 2001 S.D. 33, ¶ 22, 623 N.W.2d 84, 90. The question of whether mutual assent exists may present disputed questions of fact. *Vander Heide v. Boke Ranch, Inc.*, 2007 S.D. 69, ¶ 20, 736 N.W.2d 824, 832. This is particularly the case when there are disputed facts concerning the existence of an oral contract. *See id.* ¶¶ 19-20, 736 N.W.2d at 832; *Liebig v. Kirchoff*, 2014 S.D. 53, ¶¶ 36-37, 851 N.W.2d 743, 752. However, in the absence of disputed facts, the question of whether mutual assent exists to create a contract "is a question of law and is to be judged on the objective facts of the particular case." *Amdahl v. Lowe*, 471 N.W.2d 770, 774 (S.D. 1991). Khan Comfort argued to the circuit court, and to this Court, that disputed facts exist concerning mutual assent to the terms of the written September document Khan signed. For reasons explained more fully below, we conclude that the record does not support this claim. As such, the circuit court's determination that an express contract did not exist is a question of law that we review de novo.

[¶19.] The "[e]lements essential to existence of a contract are: (1) [p]arties capable of contracting; (2) [t]heir consent; (3) [a] lawful object; and (4) [s]ufficient cause or consideration." SDCL 53-1-2. Contracts may be express or created by

implication.  SDCL 53-1-3 provides in part that "[a]n express contract is one, the terms of which are stated in words.  An implied contract is one, the existence and terms of which are manifested by conduct."  An agreement is an express contract "if the terms are stated in words, oral or written."  *Weller v. Spring Creek Resort, Inc.*, 477 N.W.2d 839, 841 (S.D. 1991).

[¶20.]        An implied-in-fact contract is created when "the intention as to [the contract] is *not* manifested by direct or explicit words by the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used, or acts done by them, or other pertinent circumstances attending the transaction."  *Id.* (emphasis added).[5]  Because "[a]n implied contract . . . must contain all the elements of an express contract," *Setliff v. Akins*, 2000 S.D. 124, ¶ 63, 616 N.W.2d 878, 895 (emphasis omitted), both express and implied-in-fact contracts require mutual assent.  For implied contracts, however, assent occurs when, after reviewing the facts objectively, "a party voluntarily indulges in conduct reasonably indicating assent[.]"  *Id.* ¶ 13, 616 N.W.2d at 885.

[¶21.]        The circuit court analyzed the circumstances surrounding the parties' business relationships and their testimony at trial and concluded that the parties never agreed to a single, express, written contract.  Instead, the court determined

---

5.        We note that a second type of implicit contract—those that are implied in law—also exist.  *Bollinger v. Eldredge*, 524 N.W.2d 118, 123 (S.D. 1994).  "Contracts implied in law are fictions of law adopted to achieve justice where no true contract exists."  *Id.*  They are often "referred to as 'quasi' or 'constructive contracts' and do not arise because of a manifestation of intention to create them, but rest upon equitable principles that a person shall not be permitted to enrich himself unjustly at the expense of another."  *Id.*

that the September document, invoices, and change orders that the parties exchanged throughout the renovation amounted to a series of divisible, implied-in-fact contracts. We disagree.

[¶22.] While Khan Comfort argued at trial that disputed facts existed concerning the existence of a written contract, Khan's own testimony was contrary to this assertion. "[A] party to a lawsuit cannot claim the benefit of a version of relevant facts more favorable to his own contentions than he has given in his own testimony." *Law Capital, Inc v. Kettering*, 2013 S.D. 66, ¶ 13, 836 N.W.2d 642, 646. In reviewing the record, it is apparent that Khan Comfort agreed to the terms of an express contract as shown by its affirmation of the terms of the September document in its answer and statement of undisputed material facts filed in response to J. Clancy's motion for summary judgment.[6] Prior to trial, however, counsel for Khan Comfort changed course, arguing that the September document did not reflect the parties' agreement. Instead, as Khan Comfort's counsel explained at length in his pretrial brief, "[i]n all sincerity, legal counsel for Khan Comfort, LLC, has struggled with how to seek to characterize the terms of the business relationship between J. Clancy, Inc., and Khan Comfort, LLC."

[¶23.] At trial, Khan Comfort's counsel claimed that he began "with the belief and understanding that the parties thought they had a contract [September document][;] as things have developed, it appear[ed] to [counsel] that the evidence

---

6. "Khan Comfort has . . . been deprived of the benefit of the bargain *agreed to under the terms* of the [September document]." *See* Answer at 27-28, *J. Clancy v. Khan Comfort, LLC* 94 (No. Civ. No. 13-171) (emphasis added). *See also* Response to Plaintiff's Statement of Undisputed Material Facts at 46, *J. Clancy v. Khan Comfort, LLC* 77 (No. Civ. No. 13-171) (emphasis added).

in this case is going to lead the [c]ourt to the conclusion that there was no meeting of the minds[.]" Khan testified that he believed the September document, which J. Clancy sent to Khan Comfort unsigned, was only a *proposal* from J. Clancy listing the areas that needed renovation and the total *estimated* cost. However, Khan contradicted this position when asked on cross-examination whether "[t]he agreement between [Khan Comfort] and [J.] Clancy [was] controlled by [the September document]." Khan answered the question in the affirmative.[7]

[¶24.] Nevertheless, in support of this theory that the September document lacked mutual assent, Khan Comfort pointed to a series of invoices that J. Clancy sent to Khan Comfort before Khan Comfort signed the September document. Khan Comfort's approach, however, seeks to ignore the stated terms of the express agreement in the September document and overlooks the undisputed facts in the record. Khan admitted that he signed the September document and wired 50% of the contract price ($154,000) to J. Clancy on September 6, 2012 as required by the

---

7. Khan testified as follows:

> Q: . . . Did you, when you read every line of Plaintiff's Exhibit 1 [September document], talk to Mr. Clancy and say, "Hey, Mr. Clancy, there's a lot of items that aren't included in our contract that are in the PIP"? You never ever said a word, did you?
> A: [Khan]: Whatever was in the contract [September document] we agree[d] on.
> Q: In the contract?
> A: Yes.
> Q: Which is Plaintiff's Exhibit 1?
> A: Yeah.
> . . .
> Q: Okay. The agreement between you and Mr. Clancy is controlled by Plaintiff's Exhibit 1?
> A: Yes.

provisions in the document. Importantly, "[a]n acceptance must be absolute and unqualified or must include in itself an acceptance of that character which the proposer can separate from the rest and which will conclude [sic] the person accepting." SDCL 53-7-3.

[¶25.]     Here, in light of the conduct of the parties surrounding the September document, Khan's signature constituted an unqualified acceptance. "[A]s a general principle, one who accepts a written contract is conclusively presumed to know its contents and to assent to them, in the absence of fraud, misrepresentation, or other wrongful act by another contracting party." *Inst. of Range & the Am. Mustang v. Nature Conservancy*, 2018 S.D. 88, ¶ 25, 922 N.W.2d 1, 8. "To permit a party, when sued on a written contract, to admit that he signed it but to deny that it expresses the agreement he made . . . would absolutely destroy the value of all contracts." *Dinsmore v. Piper Jaffray, Inc.*, 1999 S.D. 56, ¶ 12, 593 N.W.2d 41, 44. Khan's signature on the September document and his payment by wire constitutes an absolute and unqualified acceptance of the terms of the document. Moreover, upon receipt of the payment, J. Clancy immediately began the hotel renovations. Such conduct by the parties hardly suggests that they were laboring under a series of implied-in-fact agreements without basic, mutual assent to the September document. Rather, J. Clancy's continuing performance and submission of invoices to Khan Comfort, as required under the September document, and Khan Comfort's payments to J. Clancy evince mutual assent.

[¶26.]     Further, the essential terms of an express contract were present in the September document. The document listed the subject matter of the work to be

performed, the quantity of materials to be ordered and installed, the price for the goods, and the parties' payment terms. Missing from the September document was a timeline for completion of the work. This, however, is not fatal. "If no time is specified for the performance of an act, a reasonable time is allowed." SDCL 53-10-2.

[¶27.] Accordingly, "[w]here there is a valid express contract existing between parties in relation to a transaction fully fixing the rights of each, there is no room for an implied promise." *Koopman*, 2020 S.D. 37, ¶ 20, 945 N.W.2d at 928. "[A]n express contract precludes the existence of a contract implied by law or a quasi-contract." *Jurrens v. Lorenz Mfg. Co. of Benson, Minn.*, 1998 S.D. 49, ¶ 6, 578 N.W.2d 151, 153. Therefore, the circuit court erred in holding that a divisible implied-in-fact contract, rather than an express contract defined by the terms of the September document, controlled the parties' rights and obligations.

*Breach of the September document*

[¶28.] The circuit court's starting point for determining breach should have been the express terms of the September document.[8] Under the terms of the agreement, Khan Comfort was obligated to make periodic progress payments to J. Clancy. Section 5(B) of the September agreement provides that:

---

8. After a circuit court properly determines the question of breach, "[t]here is no distinction in legal effect between an express contract and an implied[-in-fact] contract." *St. John's First Lutheran Church in Milbank v. Storsteen*, 77 S.D. 33, 37, 84 N.W.2d 725, 727 (1957). While this is true regarding the effect of a breach, in this case, the terms of the series of implied-in-fact contracts found by the trial court were not the same as the express terms of the contract made by the parties in the September document. This vital distinction changes how a party may be found to be in breach and the remedies available to the parties.

> The balance of the Contract Price will be paid to Contractor via
> progress payments which may include ordered, but not delivered
> imported goods. Contractor shall periodically present to Owner
> statements for progress payments. The owner will then issue
> checks to the Contractor without any reduction, setoff or
> holdback for such progress payments within ten days of
> presentation of the statements for the progress payments. If
> payment is not received by Contractor within ten days of
> presentation of statements for progress payments, Contractor
> may immediately cease performance until such payments are
> received.

Under this provision, J. Clancy had the right to demand progress payments from Khan Comfort, after providing invoice statements. Notably, Khan Comfort did not have the authority to hold back progress payments even if the goods were not yet delivered. Further, if Khan Comfort did not provide J. Clancy progress payments within ten days, J. Clancy had the right to immediately stop construction.[9]

[¶29.] Because the circuit court's findings of fact and conclusions of law do not address this provision, the circuit court must determine, on remand, which party is in breach under the framework of the express contract.[10] This is a question

---

9. Besides the first payment of $154,000, the record shows that Khan Comfort only remitted two progress payments to J. Clancy from September until December (two $35,000 payments). J. Clancy submitted many invoices during this timeframe and the bargained-for-contract-price limit had not been reached.

10. As the basic determination of breach remains unsettled, so also is the accompanying determination of damages. If Khan Comfort is found to have breached the contract (or failed to pay for any of the agreed-upon change orders), J. Clancy may measure its damages by the contract price less expenses not incurred as a result of the work not performed. "When the owner terminates the work after it has begun but before it is completed, the measure of damages is the contract price less savings effected by the contractor by not doing the remaining work, or put differently, the contract price less the cost the contractor would incur to complete the job." *See* Dan B. Dobbs et. al, *Law of Remedies* § 12.18(1), 887 (3d ed. 2018). This measure of

(continued . . .)

of fact that we do not reach despite the detailed nature of the court's factual findings and the voluminous record. Only after the question of breach under the provisions of the express contract is resolved can a determination be made as to what remedies may be available to either or both parties.

> **II.** **Whether the circuit court erred in holding that the mechanic's liens were not sufficiently itemized pursuant to SDCL 44-9-16.**

[¶30.] J. Clancy contends that the circuit court erred by invalidating its liens upon the property and concluding that it failed to meet the itemization requirement of SDCL 44-9-16(7). Alternatively, J. Clancy submits that its liens are sufficient under the requirements set forth in *Ringgenberg v. Wilmsmeyer*, 253 N.W.2d 197, 201 (S.D. 1977).[11]

---

(. . . continued)

damages may encompass "lost profits which are direct damages and represent the benefit of the bargain (such as a general contractor suing for the remainder of the contract price less his saved expenses)[.]" *Stern Oil Co., Inc. v. Brown*, 2018 S.D. 15, ¶ 19, 908 N.W.2d 144, 152. If J. Clancy is found to have breached, Khan Comfort may be entitled to damages for amounts paid for materials or work not performed. Further, the express contract allows for the recovery of a prevailing party's attorney fees, whoever that might be.

Regardless of whether one or both parties breached the contract, when determining the appropriate remedies on remand, the circuit court may rely upon the existing evidence in the record regarding the materials and labor found to have been provided by J. Clancy, and the sums Khan Comfort paid for the agreed-upon items. The circuit court may then adopt or modify its original findings, or enter new findings as the court deems necessary, to conform with our determination that the duties and obligations of the parties are governed by the express terms of the written contract.

11. We review a trial court's conclusions under a de novo standard. *Action Mech., Inc. v. Deadwood Hist. Pres. Comm'n*, 2002 S.D. 121, ¶ 12, 652 N.W.2d 742, 748. "Findings of fact will not be set aside unless they are clearly erroneous.

(continued . . .)

[¶31.]     A mechanic's lien is a statutory creation which ensures that persons or entities, who have provided labor and materials toward the improvement of another's property and file a lien, will get paid. *Action Mech., Inc. v. Deadwood Hist. Pres. Comm'n*, 2002 S.D. 121, ¶ 17, 652 N.W.2d 742, 749. Pursuant to SDCL 44-9-6, a claimant must set its lien for the "reasonable value of the work done, and of the skill, material, and machinery furnished." Mechanic's liens are "merely a security interest given to aid in satisfaction of a debt." *Lytle v. Morgan*, 270 N.W.2d 359, 361 (S.D. 1978). Therefore, in order "[f]or a mechanic's lien to attach to improvements on the property, an obligation must exist under either an express or implied contract." *Action Mech., Inc.*, 2002 S.D. 121, ¶ 35, 652 N.W.2d at 753 (citing SDCL 44-9-1). *See also St. John's First Lutheran Church in Milbank v. Storsteen*, 77 S.D. 33, 37, 84 N.W.2d, 725, 727 (1957) ("[I]t is essential that the items for which a lien is claimed be furnished under a contract either express or implied.").

[¶32.]     After determining a contractual obligation exists, "[a] lien claimant need not elect between the remedy of pursuing its rights under contract and the remedy under the lien; the two remedies are concurrent and may be pursued simultaneously or in succession, although there can be only one satisfaction." 56 C.J.S. Mechanics' Liens § 373 (2020).[12] The "election-of-remedies rule . . . does not

---

(. . . continued)
    A finding of fact is clearly erroneous if we are left with a definite and firm conviction that a mistake has been made." *Id.* (citation omitted).

12.    *See also Tilt-Up Concrete, Inc. v. Star City/Fed., Inc.*, 621 N.W.2d 502, 507 (2001) (listing the jurisdictions which follow the long-established rule that a mechanic's lien and a breach of contract action are distinct but not inconsistent remedies).

prohibit assertion of multiple causes of action, nor does it preclude pursuit of consistent remedies, even to final adjudication, so long as the plaintiff receives but one satisfaction." *Stabler v. First State Bank of Roscoe*, 2015 S.D. 44, ¶ 13, 865 N.W.2d 466, 475.

[¶33.] Here, there was an express agreement governing the rights and duties of the parties, and J. Clancy's liens will properly attach to Khan Comfort's property if they complied with the provisions of SDCL 44-9-16. SDCL 44-9-16(2) necessitates that a lien set forth "[t]hat such amount is due and owing to the claimant for labor performed, or for skill, services, material, or machinery furnished, and for what improvement the same was done or supplied[.]" Further, SDCL 44-9-16(7) provides that the lien statement filed by a party shall set forth "[a]n itemized statement of the account upon which the lien is claimed." In *Dakota Craft, Inc. v. Severson*, we explained that "this statutory language is construed liberally[.]" 2009 S.D. 56, ¶ 8, 769 N.W.2d 434, 437. However, "the lien claimant must substantially comply with its requirements. . . . Failure to sufficiently itemize the account renders the lien invalid. The test is whether the itemization provided sufficient detail 'to notify an ordinarily intelligent and careful person what work was actually accomplished on the property in question.'" *Id.* (citations omitted).

[¶34.] J. Clancy cites *Ringgenberg v. Wilmsmeyer* in support of its position that the itemization attached to its lien statements is sufficient to support the validity of the liens. 253 N.W.2d 197, 201 (S.D. 1977). In *Ringgenberg*, the Court analyzed the itemization requirement and reasoned that a court "should not decide substantial compliance in a vacuum. Care should be taken to consider the nature of

the business involved." *Id.* At times, missing details regarding "the amount of labor performed and at what hourly wage . . . do[] not dictate the invalidity of [a] particular statement[.]" *Id.* However, the information provided must be "sufficient to allow the owner to ascertain and verify the correctness of the lien." *Id.*

[¶35.]    *Ringgenberg* has been successfully applied in cases where the parties' agreement covers both material and labor, and, because of the nature of the work performed, it was "not necessary, even if possible, to furnish further detail as to materials or labor." 253 N.W.2d at 201. In such cases "[w]here the work is contracted for as an entirety for a specific amount," and where "[t]he information provided is sufficient to allow the owner to ascertain and verify the correctness of the lien[,]" the liens were upheld as valid under SDCL 44-9-16. *See id.* (holding that a lien statement was valid even though it neither "specifically itemize[ed] the number of rocks or amount of cement used to construct the rock façade[,]" nor "detail[ed] the amount of labor performed and at what hourly wage").

[¶36.]    Our review, therefore, requires an assessment of J. Clancy's lien statements to determine whether they comply with SDCL 44-9-16 or, alternatively, whether *Ringgenberg* applies. J. Clancy amended the smaller of the two statements, totaling $7,422.05, to include the materials and labor required to install the bathroom vanities. Attachments to the statement provided the following itemizations for the bathroom vanities: the cost per base at $233.00, the number of bases at 58, taxes, and shipping charges. The attachments also document that J. Clancy employed two individuals to install the vanities from February 4 to February 15, 2013, at a rate of $40 per hour, for a total labor cost of $2,200.

Undoubtedly, this lien statement complied with SDCL 44-9-16. We reverse the circuit court's conclusion to the contrary.

[¶37.] J. Clancy's larger lien statement claimed $97,713.28 for unpaid materials and labor resulting from work completed under the September document and seven change orders. J. Clancy attached to the lien statement the September document and the change orders which set forth an itemized list of the materials provided, including the price per item. Additionally, J. Clancy attached various invoices for materials and labor. The circuit court concluded that J. Clancy's failure to itemize its labor costs under SDCL 44-9-16(7) and its inability to prove it performed the labor under SDCL 44-9-16(2) rendered the entire lien invalid.

[¶38.] As we examine the lien statement for its compliance with SDCL 44-9-16 or to determine whether the holding in *Ringgenberg* applies, we note that invoice 1211 details installation labor costs totaling $83,005.25. It is further broken down into two sets of projects which correspond with the same labor costs quoted in the September document ($77,765 and $3,580 in addition to tax in the amount of $1,660.25). The first set of projects in the September document, as set forth in invoice 1211, provides $77,765 for "[i]nstallation" of all of the following: "For guest room bath, wall vinyl, doors. Breakfast and lobby FF&E items including floor tile, wall vinyl, built in items, new partition doors for breakfast area. Business center, exercise room, meeting room, public area bathrooms[.]" And the second set of projects in the September document referenced in invoice 1211 provides "[i]nstallation" costs of $3,580 for the following: "Front Desk Remodel . . . : Remove existing walls and install new walls as per drawing of new layout of front desk

area[.]"[13]  As for the seven change orders, J. Clancy attached invoices and various other documents to the lien statement describing the subject matter of each change order.[14]  The total labor invoiced under the September document equaled $81,345, and materials and labor invoiced under the seven change orders equaled $15,549.06, together totaling $96,894.06 (which represented $819.22 less than the lien's stated amount of $97,713.28).

[¶39.]    While J. Clancy failed to *fully* itemize the labor and material charges set forth in the lien statement, we conclude that it satisfied the requirements of *Ringgenberg* because, in part, "[i]t set[] forth the cost and description of an entire project, and there was no separate agreement for either material or labor for the project." *Dakota Craft, Inc.*, 2009 S.D. 56, ¶ 13, 769 N.W.2d at 439.  Here, the parties bargained for labor costs as a lump sum which would achieve a certain result.  This aligns with our application of *Ringgenberg* in *Dakota Craft.  See id.*

---

13.   However, we note a discrepancy which appears to be inadvertent between the September document and invoice 1211, which asserts that the costs of materials are included in the installation.

14.   The following table summarizes the change orders, descriptions, and invoices:

| Change order | Job Description | Contract Price | Invoiced Amount | Invoice No. |
|---|---|---|---|---|
| 1 | Fire tape, caulk, and framing | $6,470.00 | $6,602.05 | 1213 |
| 2 | Dumpster | $864.28 | $881.92 | 1173 |
| 3 | Demolition of drywall ceiling | $1,815.00 | $1,852.04 | 1214 |
| 6 | Additional wall vinyl | $1,325.00 | $1,352.04 | 1193 |
| 7 | Table bases for breakfast area | $688.75 | $688.75 | 1179 |
| 9 | Additional window treatments and revised bed-skirt | $519.00 | $201.00 | 1192 |
| 11 | Breakfast doors and thresholds | $3,620.88 | $3,971.26 | 1224 |

(holding that a proposal for $84,275 with the description: "Apply PVC/TPO ultra guard roofing system to 180' x 36' building and [parapet] all adhesive fasteners and flashings as per print . . . all materials, labor, adhesives and taxes" satisfied *Ringgenberg*). Additionally, the change orders and matching invoices attached to the lien statement substantially complied with the requirement in *Dakota Craft, Inc.*, such that an "ordinarily intelligent and careful person" could understand their amount and purpose. *Id*. ¶ 8, 769 N.W.2d at 437. Therefore, the circuit court erred as a matter of law by invalidating this lien under SDCL 44-9-16(7) for inadequate itemization.

[¶40.] In denying the validity of J. Clancy's mechanic's lien, the circuit court found that J. Clancy did not prove that $97,713.28 was "due and owing" for the labor it actually performed and materials it had provided. This determination was based upon the court's conclusion that J. Clancy had breached the terms of an implied contract and was only entitled to the reasonable value of its services.[15] Because we conclude that the mechanic's lien is valid under *Ringgenberg* and its progeny, the circuit court on remand must first consider whether and how much J.

---

15. Addressing the reasonable value of the services provided by J. Clancy, the circuit court found that J. Clancy had provided some of the labor and materials for which it claimed payment was due and owing. Further, it was undisputed that J. Clancy had provided labor at the hotel site for several months before leaving in February 2013. However, the court did not award any labor to J. Clancy for completed work, seemingly concluding that J. Clancy failed to present any evidence of the reasonable value of this labor. In making this determination, it is not clear whether the court considered evidence in the record showing both the hours worked at the hotel site and the value of this work. Specifically, exhibit 50 shows that J. Clancy worked 1,781 hours from September to February. Additionally, Jere Clancy testified that the hourly rate for J. Clancy's construction services was $40. This rate was also confirmed in J. Clancy's mechanic's lien introduced into evidence.

Clancy is entitled to recover under the terms of the express contract between the parties. After the court determines the questions of breach and damages, the court should then decide whether Khan Comfort owes J. Clancy any money under the mechanic's liens for labor or materials that would entitle J. Clancy to foreclose on the liens.

### III. Whether J. Clancy may bring a claim for conversion or unjust enrichment.

[¶41.] J. Clancy also argues that the circuit court erred when it rejected its conversion and unjust enrichment claims. To support this claim of error, J. Clancy contends that Khan Comfort received $371,661.08 in goods and services but only paid $244,000 for them. In J. Clancy's view, this entitles it to a judgment for conversion because the facts in the record demonstrate that Khan Comfort interfered with its property, namely the improvements it made to the hotel, without the legal right to do so. *See generally Rensch v. Riddle's Diamonds of Rapid City, Inc.*, 393 N.W.2d 269, 271 (S.D. 1986). However, J. Clancy did not present the argument to the circuit court that Khan Comfort converted its property. It is our policy not to address unpreserved claims on appeal. *People in Interest of M.S.*, 2014 S.D. 17, ¶ 17 n.4, 845 N.W.2d. 366, 371 n.4. Therefore, we decline to address J. Clancy's conversion claim.

[¶42.] J. Clancy also contends that it is entitled to recover $127,661.08 for its unjust enrichment claim, because it provided Khan Comfort with goods and services without receiving payment. "Unjust enrichment contemplates an involuntary or nonconsensual transfer, unjustly enriching one party. The equitable remedy of restitution is imposed because the transfer lacks an adequate legal basis." *Johnson*

*v. Larson*, 2010 S.D. 20, ¶ 8, 779 N.W.2d 412, 416. In contrast, where "there is a valid and enforceable contract, . . . liability for compensation or other resolution of the breach is fixed exclusively by the contract." *Id.* ¶ 9, 779 N.W.2d at 416.

[¶43.] Although parties are free to plead in the alternative, generally "[w]here a party seeks damages pursuant to both a statutory and an equitable claim, the very existence of the statutory claim[] bars recovery on the equitable claim[.]" *CMI Roadbuilding, Inc. v. Iowa Parts, Inc.*, 920 F.3d 560, 566 (8th Cir. 2019) (applying analogous Iowa law). This is because, unless fraud or bad faith exists, a claimant alleging breach of contract generally has a "full, adequate and complete" remedy available at law. *Holzworth v. Roth*, 78 S.D. 287, 291-92, 101 N.W.2d 393, 395-96 (1960). *See also Mealy v. Prins*, 2019 S.D. 57, ¶ 43, 934 N.W.2d 891, 903 (holding that a party cannot use unjust enrichment to circumvent a statute of limitations for breach of contract). "There is no question but what, where there is a valid express contract existing between parties in relation to a transaction fully fixing the rights of each, there is no room for an implied promise, or [claim] on quantum meruit." *Burch v. Bricker*, 2006 S.D. 101, ¶ 18, 724 N.W.2d 604, 609-10.

[¶44.] The trial court rejected J. Clancy's unjust enrichment claim, holding that the implied-in-fact contract "controls the relationship between" the parties. We note that while J. Clancy acknowledges the trial court's holding that a contract controlled this transaction, it does not attempt to argue, as *Holzworth* requires, that equity is appropriate because no adequate legal remedy exists. Because the court decided this action based on the parties' relative remedies at law, equity will not interfere in this case, even though the court incorrectly held that the contract was

implied-in-fact rather than express. The parties' rights and obligations are controlled under the terms of the express contract rather than in equity. We affirm the court's determination on this issue.

## Conclusion

[¶45.]        The trial court erred in holding that a divisible implied-in-fact contract controlled the parties' express agreement, and we reverse and vacate the court's conclusions which hold otherwise. On remand, the court must undertake a determination of breach and remedies available to the parties under the express terms of the September document and any agreed-upon change orders. We also reverse the trial court's decision to invalidate both mechanic's liens filed by J. Clancy. After determining the questions of breach and damages on remand, the court should then determine whether J. Clancy is entitled to foreclose on either lien for any amounts covered thereunder to which the court determines it is entitled. Because J. Clancy failed to make arguments regarding its conversion claim to the circuit court, we decline to address the issue on appeal. Finally, because a valid, express contract controls the parties' obligations, the parties may not proceed for equitable relief.

[¶46.]        JENSEN, Chief Justice, and SALTER and DEVANEY, Justices, and GILBERTSON, Retired Chief Justice, concur.

[¶47.]        MYREN, Justice, not having been a member of the Court at the time this action was submitted to the Court, did not participate.